USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __3/31/2021__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THOR EQUITIES, LLC,

                          Plaintiff,

-against-

FACTORY MUTUAL INSURANCE
COMPANY,

                          Defendant.

20 Civ. 3380 (AT)

**MEMORANDUM
AND ORDER**

ANALISA TORRES, District Judge:

       This is an action for anticipatory breach of contract with respect to a commercial property insurance policy issued by Defendant, Factory Mutual Insurance Company ("FM"), to Plaintiff, Thor Equities, LLC ("Thor"). Thor seeks damages and a judgment declaring that FM is required to pay Thor for losses arising from the COVID-19 pandemic. Compl., ECF No. 1. The parties cross-move for partial judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), seeking a ruling on whether two exclusions in the insurance policy bar coverage of Thor's losses. ECF Nos. 32, 38; Pl. Mem. at 2–3, ECF No. 34; Def. Mem. at 2–3, ECF No. 44. For the reasons stated below, the motions are DENIED.

## BACKGROUND[1]

       Thor, a commercial landlord, rents properties across the country to hundreds of tenants, for use in a variety of businesses, including office space, retail stores, restaurants, and bars. Compl. ¶ 13. On March 13, 2020, Thor purchased from FM an insurance policy that provides up to $750 million in coverage for property damage and business interruption losses

---

[1] The following facts are taken from the complaint and are presumed to be true for the purposes of considering the motion for judgment on the pleadings. *Patel v. Contemp. Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001).

(the "Policy").  Policy, ECF No. 1-1; Compl. ¶¶ 3, 20, 24, 65.  Coverage began on March 15, 2020.  Policy at 2–3; Compl. ¶¶ 20–21.

Days later, state governments across the country adopted stay-at-home orders in response to the COVID-19 pandemic.  Compl. ¶¶ 15–17.  As a result, many of Thor's tenants had to close shop and, unable to generate revenue, have requested abatements or other accommodations.  *Id.* ¶ 18.  Thor alleges that it has suffered significant business interruption as a result of the pandemic.  *Id.*

Additionally, Thor alleges that confirmed cases of COVID-19 at multiple properties have required it to take action to secure and preserve those locations.  *Id.* ¶ 19.  When Thor commenced this action, it estimated that it had already lost more than $20 million in rental income alone.  *Id.*

Broadly, the Policy provides for a maximum per-occurrence limit of liability of $750 million, with various sublimits and time limits.  *Id.* ¶ 22; Policy at 12–15.  The Policy defines an occurrence as "the sum total of all loss or damage of the type insured, including any insured [time element] loss, arising out of or caused by one discrete event of physical loss or damage."  Compl. ¶ 23; Policy at 78.

The Policy contains various "[a]dditional [c]overages" under the property damage section of the Policy as well as "[t]ime [e]lement" coverages, commonly known as business interruption coverages, all of which potentially implicate Thor's losses here.  Compl. ¶¶ 24–52; Pl. Mem. at 1.  The additional coverages section includes a "[communicable disease response]" provision and the time element section includes an "[interruption by communicable disease]" provision (the "Communicable Disease Provisions"), which together have a $1 million aggregate limit on liability.  Policy at 13, 15, 32, 64–65.  The "time element" provisions cover, in part, losses from the interruption of Thor's business, including loss of rental income, loss caused by restriction of

2

access to Thor's property due to an order issued by a civil or military authority, loss caused by restriction of access to the entry or exit of property, and loss caused by physical loss or damage at the property of suppliers or customers. *Id.* at 52, 58–60, 76. The Policy also contains various exclusions, including: (1) a contamination exclusion (the "Contamination Exclusion") and (2) a loss of market or loss of use exclusion (the "Loss of Market or Loss of Use Exclusion"), which both limit coverage on these bases. *Id.* at 20–21, 24. These exclusions are located under the property damage section of the Policy. *Id.* at 19–21, 24.

Thor states that it gave FM "prompt notice of its claim for its coronavirus losses" (without specifying the date and manner of such notice). Compl. ¶ 53. In an April 6, 2020 phone call, Thor's counsel indicated to William Reed, FM's New York claims manager, that "Thor's claim would greatly exceed the Policy's $1 million sublimit for the communicable disease coverages." *Id.* In a "formal acknowledgement letter," FM stated: "We understand this loss is reported for a claim to be submitted under the Policy's [additional coverages] for [communicable disease response] and [interruption by communicable disease]." *Id.* ¶ 54. Thor appears to interpret FM's focus on the Communicable Disease Provisions as an indication that FM will breach its obligation to cover Thor's losses under other Policy provisions. *Id.* ¶ 55. In this action for anticipatory breach of contract, Thor seeks a judgment declaring that FM must cover Thor's coronavirus-related losses to the full extent of the Policy. *Id.* ¶ 60.

At this juncture, however, the parties do not ask the Court to determine in general whether the Policy covers Thor's losses. Pl. Mem. at 2. Rather, the parties request that the Court determine the applicability and scope of the Contamination Exclusion and the Loss of Market or Loss of Use Exclusion. *Id.* at 2–3; Def. Mem. at 2–3, 9.

**DISCUSSION**

I. <u>Legal Standard</u>

Under Federal Rule of Civil Procedure 12(c), "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). In deciding a Rule 12(c) motion, a court applies the same standard as that applicable to a motion under Rule 12(b)(6). *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1994). In order to survive a Rule 12(c) motion, therefore, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The court must accept the allegations in the pleadings as true and draw all reasonable inferences in favor of the non-movant. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

In evaluating a Rule 12(c) motion, the court may consider only the complaint, documents attached to the complaint, matters of which a court can take judicial notice, and documents that the plaintiff knew about and relied upon in bringing suit. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). A claim will not be dismissed on a motion for judgment on the pleadings unless the court is satisfied that the complaint cannot state any set of facts that would entitle plaintiff to relief. *Sheppard*, 18 F.3d at 150.

II. <u>Choice of Law</u>

Because this Court's subject matter jurisdiction is grounded in diversity between the parties, the Court must first determine the body of substantive law that applies to Plaintiff's claims. *See Booking v. Gen. Star Mgmt. Co.*, 254 F.3d 414, 419 (2d Cir. 2001). "The . . . law to be applied is determined by the choice of law principles of the forum state." *Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 132 (2d Cir. 1993). For contract claims, New York choice of law rules require the Court to evaluate the "center of gravity," with the purpose of establishing

4

which state has "the most significant relationship to the transaction and the parties." *Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 394 (2d Cir. 2001) (internal quotation marks and citation omitted).

The parties do not directly address choice of law, but they apply New York law in their briefs. Accordingly, the Court shall apply New York law here. *Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 39 (2d Cir. 2009).

   III.   Contract Interpretation Under New York Law

"Insurance policies are, in essence, creatures of contract, and, accordingly, subject to principles of contract interpretation." *Zahler v. Twin City Fire Ins. Co.*, No. 04 Civ. 10299, 2006 WL 846352, at *4 (S.D.N.Y. Mar. 31, 2006). A fundamental principle under New York law is that "contracts are construed in accord with the parties' intent." *Greenfield v. Philles Records*, 780 N.E.2d 166, 170 (N.Y. 2002). The best evidence of that intent is what the parties have written in their agreement. *Id*. Therefore, a court must "give effect to the intent of the parties as expressed in the clear language of the [insurance] contract," *Parks Real Est. Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006), and interpret the contract "according to common speech and consistent with the reasonable expectation of the average insured," *Dean v. Tower Ins. Co. of New York*, 979 N.E.2d 1143, 1145 (N.Y. 2012).

Under New York law, "a written agreement that is complete, clear, and unambiguous on its face must be enforced according to the plain meaning of its terms." *Greenfield*, 780 N.E.2d at 170; *Vill. of Sylvan Beach v. Travelers Indem. Co.*, 55 F.3d 114, 115 (2d Cir. 1995). Contract language is unambiguous if it has a "definite and precise meaning, unattended by danger of misconception . . . and concerning which there is no reasonable basis for a difference of opinion." *Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990) (internal quotation marks, alteration, and citation omitted).

"Ambiguity in a contract arises when the contract, read as a whole, fails to disclose its purpose and the parties' intent, or where its terms are subject to more than one reasonable interpretation." *Universal Am. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 37 N.E.3d 78, 81 (N.Y. 2015) (internal quotation marks and citations omitted). "[T]he test to determine whether an insurance contract is ambiguous focuses on the reasonable expectations of the average insured upon reading the policy and employing common speech." *Matter of Mostow v. State Farm Ins. Cos.*, 668 N.E.2d 392, 395 (N.Y. 1996) (internal citations omitted). "However, parties cannot create ambiguity from whole cloth where none exists, because provisions are not ambiguous merely because the parties interpret them differently." *Universal Am. Corp.*, 37 N.E.3d at 81 (internal quotation marks and citations omitted).

"It is well established under New York law that a policyholder bears the burden of showing that the insurance contract covers the loss." *Morgan Stanley Grp. Inc. v. N. England Ins. Co.*, 225 F.3d 270, 276 (2d Cir. 2000). If the policyholder carries that burden, then the "insurer bears the burden of proof [to show] that an exclusion in the policy applies to an otherwise covered loss." *Id*. at 276 n.1.

### A.   Contamination Exclusion

The parties dispute whether the Contamination Exclusion bars Thor's claimed losses. For the reasons below, the Court concludes the language of the exclusion is ambiguous, and judgment on the pleadings inappropriate. *U.S. Bank Nat'l Ass'n v. Triaxx Asset Mgmt. LLC*, No. 16 Civ. 8507, 2017 WL 3610584, at *7 (S.D.N.Y. July 26, 2017).

The Policy contains the following Contamination Exclusion:

> D. This Policy excludes the following unless directly resulting from other physical damage not excluded by this Policy:
>
> 1) **contamination,** and any cost due to **contamination** including the inability to use or occupy property or any cost of making property safe or suitable for use

>or occupancy.  If **contamination** due only to the actual not suspected presence of **contaminant(s)** directly results from other physical damage not excluded by this Policy, then only physical damage caused by such **contamination** may be insured. . . .

Policy at 24 (emphasis in original).  Contamination is defined as:

>any condition of property due to the actual or suspected presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, *virus*, disease causing or illness causing agent, fungus, mold or mildew.

*Id.* at 76 (emphasis added).  The parties agree that the inclusion of "virus" in the definition of contamination covers COVID-19.  Pl. Mem. at 16–17; Def. Mem. at 1.

Even though the parties dispute the meaning of the Contamination Exclusion, each claim that the exclusion's language is unambiguous.  Pl. Mem. at 20; Def. Mem. at 5.  Thor argues that the Contamination Exclusion's failure to mention any *loss* "due to contamination," while explicitly referencing "any *cost* due to contamination," indicates that the exclusion does not bar coverage for Thor's business interruption losses.  Pl. Mem. at 16–20 (emphasis added).  By contrast, FM contends that the Contamination Exclusion's mention of "inability to use or occupy property" unambiguously excludes losses due to contamination caused by COVID-19, including Thor's loss of rental income.  Def. Mem. at 13.

This provision is susceptible to more than one interpretation, and potentially compatible with either party's interpretation.  When "a written contract is ambiguous, a factual question is presented as to the meaning of its provisions, requiring a factual determination as to the intent of the parties in entering the contract."  *ISC Holdings AG v. Nobel Biocare Invs. N.V.*, 351 Fed App'x 480, 482 (2d Cir. 2009) (quoting 11 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 30:7 (4th ed. 1999)); *see also U.S. Bank Nat'l Ass'n*, 2017 WL 3610584, at *7.

On the one hand, Plaintiff's reading of the exclusion could tend to render certain aspects of the exclusion meaningless. *Rutgerswerke AG and Frendo S.p.A. v. Abex Corp.*, No. 93 Civ. 2914, 2002 WL 1203836, at *7 (S.D.N.Y. June 4, 2002) ("[U]nder New York law . . . a court must interpret a contract so as to give effect to all of its clauses and to avoid an interpretation that leaves part of a contract meaningless."). Because the first two words of the exclusion—"contamination, and"—must be given effect, the exclusion could reasonably be read to encompass more than just "any costs due to contamination." *Cf. Svensson v. Securian Life Ins. Co.*, 706 F. Supp. 2d 521, 534 (S.D.N.Y. Mar. 31, 2010).

On the other hand, it similarly cannot be said that the exclusion unambiguously forecloses recovery on Thor's losses due to contamination, and thus the Court cannot conclude that "there is no reasonable basis for a difference of opinion." *Metro. Life Ins. Co.*, 906 F.2d at 889. For instance, the Policy distinguishes between "cost" and "loss" elsewhere, but no such distinction is present here. *See, e.g.*, Policy at 31–34, 45, 56–66. Moreover, the plain meaning of cost—"the amount paid or charged for something"—could plausibly refer to affirmative outlays, like paying for temporary use of other property. *Cost*, Black's Law Dictionary (11th ed. 2019); Pl. Mem. at 18–19 n.9.

Accordingly, because the Court finds that the Contamination Exclusion is ambiguous, judgment on the pleadings as to the applicability of the exclusion is inappropriate at this stage of the litigation, and the parties' motions are DENIED.

    B.    Loss of Market or Loss of Use Exclusion

Next, the parties dispute the applicability and scope of the Loss of Market or Loss of Use Exclusion. Without a developed factual record, however, a decision on the parties' motions is inappropriate at this juncture.

The Loss of Market or Loss of Use Exclusion states:

> 3. In addition to the exclusions elsewhere in this Policy, the following exclusions apply unless otherwise stated:
>
> A. This Policy excludes: . . .
>
> 3) loss of market or loss of use.

Policy at 20–21.

The Policy does not define "loss of use." *See generally* Policy. But the absence of a definition does not render the exclusion ambiguous. *Lend Lease (U.S.) Constr. LMB Inc. v. Zurich Am. Ins. Co.*, 22 N.Y.S.3d 24, 29 (N.Y. App. Div. 2015). Although "loss of market" and "loss of use" should not be read entirely in isolation, the exclusion is disjunctive, and the Court must strive to "give meaning to every sentence, clause, and word" of the exclusion. *See Zurich Am. Ins. Co. v. ABM Indus., Inc.*, 397 F.3d 158, 165 (2d Cir. 2005). Thus, by the plain meaning of the text, "loss of market" and "loss of use" do not necessarily serve to exclude only changing market conditions due to decreases in the business market or use of Thor's properties. Pl. Reply at 16–17, ECF No. 45.

Instead, in this context, "loss of use" could mean lack of access. New York courts commonly "refer to the dictionary to determine the plain and ordinary meaning of words to a contract." *Fed. Ins. Co. v. Am. Home Assurance Co.*, 639 F.3d 557, 567 (2d Cir. 2011). Loss includes "[t]he failure to maintain possession of a thing," *see Loss*, Black's Law Dictionary (11th ed. 2019), and this definition reasonably includes "loss of access," *DeMoura v. Continental Casualty Co.*, No. 20 Civ. 2912, 2021 WL 848840, at *6 (S.D.N.Y. Mar. 5, 2021).

*Visconti Bus Service, LLC v. Utica National Insurance Group* is also instructive on the meaning of "loss of market or loss of use." 2021 WL 609851, at *3 (N.Y. Sup. Ct. Feb. 12, 2021). That case addressed a similar exclusion in an insurance policy, which stated: "[W]e will not pay for loss or damage caused by or resulting from . . . [d]elay, loss of use or loss of market."

*Id.* (emphasis omitted). There, as here, a party sought coverage for "loss of use" resulting from a governmental order. *Id.* at *5. The court likened "loss of use" to "loss of functionality," and found that coverage for such losses was barred by the exclusion. *Id.* at *13; *see also Roundabout Theatre Co., Inc. v. Continental Cas. Co.*, 751 N.Y.S.2d 4, 9 (N.Y. App. Div. 2002) (finding loss of use to encompass loss of access).

Furthermore, there is the weight of authority in this district, which has interpreted governmental shutdown orders to cause a "loss of use" of property. Although many of those courts faced a different question[2]—and one that the parties have indicated is not at issue here—those cases have held that governmental shutdown orders as a result of the COVID-19 pandemic implicate the "loss of use" of property. *See Food for Thought Caterers Corp.*, 2021 WL 860345, at *4 (finding that COVID-19 restrictions are a "loss of use," but not a "direct physical loss of" property); *Sharde Harvey DDS, PLLC*, 2021 WL 1034259, at *6 (finding that "shutdown orders clearly impair the function and value of property" (internal quotation marks omitted)). As such, and contrary to Plaintiff's argument, the Loss of Market or Loss of Use Exclusion does not necessarily refer solely to changing market conditions due to decreases in the business market or use of Thor's properties.[3]

However, the Court concludes that a determination on whether the Loss of Market or Loss of Use Exclusion encompasses Thor's alleged losses would be inappropriate at this stage. Indeed, the complaint does not mention the Loss of Market or Loss of Use Exclusion at all. Nor

---

[2] In those cases, courts broadly determined whether COVID-19-related closures and losses constituted "direct physical loss" within the meaning of an insurance coverage policy. *See, e.g.*, *Sharde Harvey DDS, PLLC v. Sentinel Ins. Co., Ltd.*, No. 20 Civ. 3350, 2021 WL 1034259, at *6 (S.D.N.Y. Mar. 18, 2021); *Food for Thought Caterers Corp. v. Sentinel Ins. Co., Ltd.*, No. 20 Civ. 3418, 2021 WL 860345, at *4 (S.D.N.Y. Mar. 6, 2021); *DeMoura*, 2021 WL 848840, at *6.

[3] Nor does such an interpretation of the Loss of Market or Loss of Use Exclusion mean that the exclusion swallows most of the coverage provided by the Policy. *Thomas J. Lipton, Inc. v. Liberty Mut. Ins. Co*, 314 N.E.2d 37, 39 (N.Y. 1974). Rather, as noted above, the exclusion applies, "unless otherwise stated" in the Policy. Thus, to the extent that other provisions of the Policy encompass "loss of use," the exclusion is inapplicable.

does it provide a precise explanation of the alleged losses at issue here. Although Thor has represented in its pre-motion letter that the majority of its losses have been caused not by the confirmed presence of coronavirus at its premises, but by orders of state and local authorities issued in response to the coronavirus pandemic, *see* ECF No. 26, these representations are not properly considered on a motion for judgment on the pleadings. *See Chambers*, 282 F.3d at 153. Even if these representations could be considered, they would not suffice to establish an adequate factual record for the Court to make a determination at this point in the litigation. *See In re World Trade Ctr. Disaster Site Litig.*, 456 F. Supp. 2d 520, 558 (S.D.N.Y. 2006).

Accordingly, the parties' motions on the Loss of Market or Loss of Use Exclusion are DENIED.

## CONCLUSION

For the foregoing reasons, the parties' motions are DENIED.

The Clerk of Court is directed to terminate the motions at ECF Nos. 32 and 38.

SO ORDERED.

Dated: March 31, 2021
New York, New York

_____
ANALISA TORRES
United States District Judge