**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

——————————————————— x
                                 :

THOR EQUITIES, LLC,               :
                                 :
           Plaintiff,         :
                                 :  Case No. 20-cv-3380-AT-GWG
      v.                         :
                                 :

FACTORY MUTUAL INSURANCE      :
COMPANY,                       :
                                 :
           Defendant.       :
                                 :
——————————————————— x

---

**DEFENDANT FACTORY MUTUAL INSURANCE COMPANY'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO EXCLUDE PROPOSED EXPERT TESTIMONY OF IGOR BURSTYN, PH.D., AND JEFFERY STEMPEL**

---

Harvey Kurzweil
Kelly A. Librera
George E. Mastoris
Adam P. Moskowitz
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
Tel.: (212) 294-6700
HKurzweil@winston.com
KLibrera@winston.com
GMastoris@winston.com
APMoskowitz@winston.com

Robert F. Cossolini
FINAZZO COSSOLINI O'LEARY
MEOLA & HAGER, LLC
67 East Park Place, Suite 901
Morristown, NJ 07960
Tel.: (973) 343-4960
robert.cossolini@finazzolaw.com

*Attorneys for Defendant Factory Mutual Insurance Company*

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND .................................................................................................... 4

      I.      Plaintiff's Claim ..................................................................................... 4

      II.     Dr. Burstyn's Statistical Model ............................................................ 5

      III.    Professor Stempel's "Custom and Practice" Testimony ..................... 8

LEGAL STANDARD .............................................................................................. 8

ARGUMENT ....................................................................................................... 10

      I.      Dr. Burstyn's testimony should be excluded in its entirety under Rule 702 and *Daubert*. ............................................................... 10

              A.    Dr. Burstyn's opinion regarding the alleged actual presence of SARS-CoV-2 on Thor's properties should be excluded as it fails to study the proper event and rests on a number of unsupported assumptions. ........... 11

                      1.    Dr. Burstyn's model does not address the relevant question: whether the novel coronavirus was actually present on Thor's properties ...................................................................... 11

                      2.    Dr. Burstyn's model fails to properly estimate the number of entrants at the relevant properties. ................................................. 16

                      3.    Dr. Burstyn's model depends on unsupported assumptions which render its conclusions unreliable and subject to exclusion under Rule 702 and *Daubert*. ....................................................... 20

              B.    Dr. Burstyn's opinions regarding stay-at-home orders and geographical mapping are not proper topics for expert testimony. ............................... 24

      II.     Professor Stempel's purported "custom and practice" testimony should be excluded in its entirety under Rule 702, *Daubert*, and Rule 403 .......................... 25

              A.    Professor Stempel's testimony on the interpretation and application of specific Policy provisions must be excluded, as it improperly expresses legal arguments and invades the province of the jury ............................... 26

              B.    Professor Stempel's testimony on the history and development of insurance policies and the insurance industry is irrelevant ...................... 28

C.      Professor Stempel's testimony on the operation of the insurance industry should be excluded as not only irrelevant but also unfairly prejudicial. ................................................................................................ 29

CONCLUSION.................................................................................................................... 31

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adell Plastics, Inc. v. Mt. Hawley Ins. Co.*,
 2019 WL 2524916 (D. Md. June 19, 2019)......................................................................3, 28

*Am. Home Assurance Co. v. Merck & Co.*,
 462 F. Supp. 2d 435 (S.D.N.Y. 2006)............................................................................27, 28

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
 303 F.3d 256 (2d Cir. 2002)..................................................................................................21

*Andrews v. Metro N. Commuter R.R.*,
 882 F.2d 705 (2d Cir. 1989).............................................................................2, 10, 24, 25

*Atl. Specialty Ins. v. AE Outfitters Retail Co.*,
 970 F. Supp. 2d 278 (S.D.N.Y. 2013)........................................................................ *passim*

*Bank of N.Y. Mellon Tr. Co. v. Solstice ABS CBO II, Ltd.*,
 910 F. Supp. 2d 629 (S.D.N.Y. 2012)................................................................11, 22, 23, 24

*Carmichael v. City of N.Y.*,
 34 F. Supp. 3d 252 (E.D.N.Y. 2014) .................................................................................9, 10

*Choi v. Tower Rsch. Cap. LLC*,
 2 F.4th 10 (2d Cir. 2021) ............................................................................................ *passim*

*City of Phx. v. First State Ins. Co.*,
 2016 WL 4591906 (D. Ariz. Sept. 2, 2016)......................................................................3, 28

*City of Providence v. Bats Glob. Mkts., Inc.*,
 2022 WL 902402 (S.D.N.Y. Mar. 28, 2022) ...................................................................14, 19

*Daubert v. Merrell Dow Pharms., Inc.*,
 509 U.S. 579 (1993)..................................................................................................... *passim*

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*,
 314 F.3d 48 (2d Cir. 2002)......................................................................................................9

*In re Fosamax Prods. Liab. Litig.*,
 645 F. Supp. 2d 164 (S.D.N.Y. 2009).......................................................................9, 12, 19

*Gen. Elec. Co. v. Joiner*,
 522 U.S. 136 (1997)..............................................................................................................21

iii

*Highland Cap. Mgmt., LP v. Schneider*,
    379 F. Supp. 2d 461 (S.D.N.Y. 2005)..................................................................27

*Humans & Res. LLC v. Firstline Nat'l Ins. Co.*,
    2022 WL 657067 (E.D. Pa. Mar. 4, 2022).............................................3, 27, 28, 29

*Hygh v. Jacobs*,
    961 F.2d 359 (2d Cir. 1992)...............................................................10, 27, 28

*Kim-Chee LLC v. Phila. Indem. Ins. Co.*,
    2022 WL 258569 (2d Cir. Jan. 28, 2022) .............................................................4

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999)...............................................................................10

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
    525 F. Supp. 2d 558 (S.D.N.Y. 2007)...............................................................11

*In re Lyman Good Dietary Supplements Litig.*,
    2019 WL 5682880 (S.D.N.Y. Oct. 31, 2019).............................................11, 12, 14

*Murphy v. Gen. Elec. Co.*,
    245 F. Supp. 2d 459 (N.D.N.Y. 2003)..........................................................18, 20

*Nimely v. City of N.Y.*,
    414 F.3d 381 (2d Cir. 2005)...............................................................10, 26, 30, 31

*In re Rezulin Prods. Liab. Litig.*,
    309 F. Supp. 2d 531 (S.D.N.Y. 2004).................................................................9

*SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*,
    467 F.3d 107 (2d Cir. 2006)..........................................................................26

## Other Authorities

Fed. R. Evid. 403 .................................................................................10, 30

Fed. R. Evid. 702 ............................................................................... *passim*

Defendant Factory Mutual Insurance Company ("FM Global") respectfully submits this Memorandum of Law in support of its motion to exclude the testimony of Plaintiff Thor Equities, LLC's ("Thor") experts Igor Burstyn, Ph.D.,[1] and Jeffrey Stempel.

## PRELIMINARY STATEMENT

The proponent of expert testimony bears the burden of establishing its admissibility.  Here, Thor's proffered biostatistics expert, Dr. Igor Burstyn, and its custom and practice expert, Professor Jeffrey Stempel, have proffered testimony which is unreliable, irrelevant and unfairly prejudicial.  Accordingly, both of their reports should be excluded as inadmissible.

*First*, Dr. Burstyn's testimony should be excluded because none of his three opinions meet the standard for permissible expert testimony in this Court.  Most critically, Dr. Burstyn's statistical model does not actually measure the likelihood that someone infected with COVID-19 was present on a Thor property.  Rather, the model calculates only the probability that a person who entered a Thor property during March 2020 became infected with COVID-19 *at some point during that month*.  And even if it did calculate the likelihood of actual presence, by Dr. Burstyn's own description, the model only calculates the probability of actual presence at "at least one" unidentified Thor property in March 2020.  It is thus irrelevant to the case at hand because it cannot assist the jury in determining whether SARS-CoV-2 was actually present on *each* of Thor's properties (much less identify *which* properties), a prerequisite to coverage in this case.

In addition to answering the wrong question, Dr. Burstyn's model is built on a hopelessly flawed methodology which generates unreliable results.  For example, despite knowing the identity of the relevant properties at issue, Dr. Burstyn failed to obtain any data on the *actual* number of

---

[1] FM Global notes that Dr. Burstyn's reports were co-authored by Dr. Neal Goldstein, and thus this motion seeks to exclude both Dr. Burstyn and Dr. Goldstein.  For convenience, and because Thor only offered Dr. Burstyn for deposition and has stated that it intends to proffer Dr. Burstyn as its relevant witness at trial, this motion refers only to Dr. Burstyn throughout.

entrants to each of those buildings in March 2020.  Without this information, his model is incapable

of reliably calculating the probability that one of those entrants introduced COVID-19 onto a Thor

property.  In addition, Dr. Burstyn's model is premised on a series of assumptions that defy both

common sense and basic scientific plausibility.  For example, despite admitting that people are

"not confined to a zip code in our daily activities," Dr. Burstyn assumes that the only entrants to a

particular Thor building in March 2020 were people residing within the *same zip code* as that

building.  In reaching his conclusions regarding the presence of COVID-19 in Thor's buildings,

Dr. Burstyn also assumes that individuals who were sick with COVID-19 in March 2020 were

equally likely to enter a Thor building as those who were healthy, and that each of the businesses

located in Thor's buildings would have continued to serve either 50 or 100 patrons every single

day of the month despite the government shutdowns that occurred in each of the cities he studied.

Each of these assumptions is unsupported and unsupportable.

Dr. Burstyn's remaining two "opinions"—that Thor's properties were subject to stay-at-

home orders and were located within five miles of hospitals or nursing homes—are not opinions

at all.  To the contrary, they express factual determinations that a jury is readily capable of making

without expert assistance.  As a result, these opinions are also inadmissible as a matter of law.

*Andrews v. Metro N. Commuter R.R.*, 882 F.2d 705, 708 (2d Cir. 1989) (holding that proffered

expert testimony cannot be directed to "lay matters which a jury is capable of understanding and

deciding without the expert's help").

*Second*, Professor Stempel's testimony, which is comprised entirely of impermissible legal

argument and irrelevant musings on the historical development of insurance policies and the

insurance industry in general, should also be excluded in its entirety.   Professor Stempel's report

says almost nothing about FM Global or the terms and conditions of the Policy at issue, and thus

fails to "fit" the facts of the case.  Making matters worse, much of Professor Stempel's testimony is little more than an attack on insurers in general, which he characterizes as "corrupt" actors who engage in "post-loss underwriting."  But FM Global's conduct in the investigation of Thor's claim is not at issue in the case, and Thor has never alleged that FM Global acted in bad faith or engaged in unfair claims practices (because it did not).  Accordingly, Professor Stempel's testimony should also be excluded as unfairly prejudicial because this irrelevant information would taint the jury's view of FM Global by associating it with the alleged misconduct of some unspecified insurers in unspecified cases at some unspecified point in the past.

As for those limited portions of Professor Stempel's report that *do* specifically address FM Global and the Policy, they constitute improper legal conclusions and improperly invade the province of the jury.  Professor Stempel repeatedly addresses the ultimate legal conclusions at issue—specifically, the application of the Policy's provisions to Thor's claim.  Such practice is apparently Professor Stempel's *modus operandi*, as his opinions have been excluded over and over again by other courts on this exact ground, including in near-identical contexts.  *See, e.g.*, *Humans & Res. LLC v. Firstline Nat'l Ins. Co.*, 2022 WL 657067, at *4 (E.D. Pa. Mar. 4, 2022) ("Professor Stempel's report goes directly to the ultimate legal conclusion"); *Adell Plastics, Inc. v. Mt. Hawley Ins. Co.*, 2019 WL 2524916, at *3 (D. Md. June 19, 2019) ("[L]egal conclusions on an ultimate issue for trial predominate Stempel's report. Rather than assisting the jury by providing specialized knowledge, Stempel seeks to replace the jury entirely."); *City of Phx. v. First State Ins. Co.*, 2016 WL 4591906, at *18 (D. Ariz. Sept. 2, 2016) ("[Stempel's] report consists largely of legal opinions" including "interpretations of language in the [relevant insurance] policies").  This Court should follow suit.

For each of these reasons, both Dr. Burstyn's and Professor Stempel's testimony should be excluded as a matter of law. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993).

## BACKGROUND

### I.   Plaintiff's Claim

Thor is a real estate company with interests in commercial properties across the United States and around the world.  Kurzweil Decl. Ex. A ¶ 2.[2]  The tenants that rent the properties in Thor's portfolio use them for a variety of purposes, including residential, office spaces, retail stores, restaurants, bars, and hotels. *See id.* ¶ 13.  Although Thor does not own any of the properties at issue in this case, it is the named insured under policy number 1063282 with FM Global (the "Policy").  *Id.* ¶¶ 3, 20; Kurzweil Decl. Ex. B at 10 [hereinafter "Policy"].  On March 26, 2020, Thor submitted a claim to FM Global alleging that it had suffered losses insured under the Policy as a result of the COVID-19 pandemic.  Kurzweil Decl. Ex. C.

With the exception of the two Communicable Disease provisions (described below), each Policy provision under which Thor seeks coverage requires a showing of physical loss or damage at the insured property or, in the case of Civil or Military Authority coverage, within five miles thereof. *See, e.g.*, Policy at 45, 58–66.  Thor claims that the presence of SARS-CoV-2 on a property causes physical loss or damage,[3] and asserts that because of the actual presence of SARS-CoV-2 on its insured properties, some of the tenants leasing those properties have been unable to use them for their intended purposes and therefore could not generate revenue to pay rent.

---

[2] Citations to "Kurzweil Decl. Ex." refer to the exhibits attached to the Declaration of Harvey Kurzweil submitted concurrently herewith.

[3] As will be explained in detail in FM Global's anticipated motion for summary judgment, the presence of SARS-CoV-2 cannot cause physical loss or damage to property as a matter of law. *See, e.g.*, *Kim-Chee LLC v. Phila. Indem. Ins. Co.*, 2022 WL 258569, at *2 (2d Cir. Jan. 28, 2022).

4

Two exclusions in the Policy are of particular relevance to Thor's claims. First, the Policy excludes coverage for "contamination," stating:

> This Policy excludes the following unless directly resulting from other physical damage not excluded by this Policy: 1) contamination, and any cost due to contamination including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy.

Policy at 24 (the "Contamination Exclusion"). "Contamination" is, in turn, defined under the Policy as:

> any condition of property due to the actual or suspected presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, **pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent**, fungus, mold or mildew.

*Id.* at 76 (emphasis added). Second, the policy excludes coverage for "loss of market or loss of use." *Id.* at 20–21 (the "Loss of Use Exclusion"). Thus, unless covered by an exception to these two exclusions, the Contamination and Loss of Use Exclusions serve as separate bars to recovery for Thor's claimed losses in this lawsuit.

Importantly, however, the Policy does provide two exceptions to the above-mentioned exclusions: the Communicable Disease Response and Interruption by Communicable Disease provisions, which do not require a showing of physical loss or damage. Both provisions, however, require Thor to show, among other things, "the actual not suspected presence" of COVID-19 on its insured properties. *Id.* at 32, 64–65.

## II.    Dr. Burstyn's Statistical Model

On November 8, 2021, Thor submitted the affirmative expert report of Igor Burstyn, Ph.D. Dr. Burstyn is an Associate Professor of Environmental and Occupational Health at the Drexel University Dornsife School of Public Health. Kurzweil Decl. Ex. D at 1 [hereinafter "Burstyn Report"]. Despite purporting to offer an opinion rooted in a biostatistical analysis, Dr. Burstyn never obtained a degree in statistics and is admittedly not a theoretical statistician. Kurzweil Decl.

Ex. G at 37:10–11, 39:15–24, 88:10–14, 88:21–89:2 [hereinafter "Burstyn Tr."].  To the contrary,

and as he admitted at his deposition, Dr. Burstyn's principal area of expertise is public health.  *Id.*

at 40:6–41:2.

In his report, Dr. Burstyn purports to offer three separate opinions:

1. Thor's properties include locations in New York City, Chicago, Miami, and San Francisco.  These cities were impacted by the COVID-19 pandemic and subject to stay-at-home orders.  By the end of March 2020, all cities had enacted such orders.

2. Data indicate that the chance was greater than 50% that a person infected with SARS-CoV-2 [] entered at least one of [] Thor's properties in either New York City, Chicago, or San Francisco prior to the end of March 2020.  This opinion is based on the calculated prevalence of infections with SARS-CoV-2 and the assumed occupancy of Thor's properties.  Data were not available for Miami.

3. Thor's properties in New York City, Chicago, Miami, and San Francisco were located within 5 miles of a hospital or nursing home.  Hospitals and nursing homes have a "high" prevalence of COVID-19 cases on their properties due to patient care operations or risk groups.

Burstyn Report at 2 (emphasis omitted).

Dr. Burstyn's first and third opinions are based exclusively on publicly available data and

are not the product of any scientific method or statistical modeling.  Rather, Dr. Burstyn's first

opinion is premised on the dates on which the mayors of New York City, Chicago, Miami, and

San Francisco issued "stay-at-home" orders, and the assumptions that (1) "[t]hese government

orders included the closure of certain businesses" and (2) "[t]enants who reported to have closed

their businesses were complying with this order."  *Id.*   Similarly, Dr. Burstyn's third opinion is

based on "publicly available data on the location of [hospitals and nursing homes] from

government websites for New York, Illinois, California, and Miami," which he used to "map[] the

location of each of Thor's properties" in relation to each of these hospitals and nursing homes.  *Id.*

at 8.  Despite his reference to the "high" prevalence of COVID-19 on such properties, Dr. Burstyn

did not examine the rates of COVID-19 at any of the hospitals or nursing homes he claims to have mapped out and offers no analysis in that regard.

Dr. Burstyn's second opinion, which comprises the heart of his report, purports to "estimate[] the probability that a person who was infected with SARS-CoV-2 was present on Thor's properties in: A) New York City, including boroughs of Manhattan and Brooklyn, New York, B) Chicago, Illinois, and C) San Francisco, California." *Id.* at 2. Dr. Burstyn's analysis is focused exclusively on the time period of March 1 through March 31, 2020. Burstyn Tr. at 95:20–96:9. Dr. Burstyn explicitly acknowledged that he relied on several assumptions in performing this analysis. These included, among other things, that: (i) 50% to 85% of individuals infected with SARS-CoV-2 were asymptomatic carriers of the virus; (ii) the only entrants to a given Thor building during March 2020 were residents of the zip code in which that building was located; (iii) all individuals residing within a given zip code were equally likely to enter any given building in the zip code, regardless of the individual's COVID-19 infection status or the type of business being operated at that building; and (iv) each business in every Thor building had at least 50 occupants a day each and every day of the month, notwithstanding the pandemic and accompanying government shutdowns. Burstyn Report at 2–3, 6; Burstyn Tr. 170:11–17; *see also* Kurzweil Decl. Ex. E at 5–6 [hereinafter "Rabinowitz Report"].

After performing his analysis, Dr. Burstyn claimed that there was a "greater than 50%" likelihood that a person infected with SARS-CoV-2 entered at least one of Thor's properties in either New York City, Chicago, or San Francisco during March 2020. Burstyn Report at 2. Critically, however, Dr. Burstyn's model uses as an input the *cumulative* number of individuals in each zip code who became infected throughout the entirety of March 2020, rather than the number of individuals in the zip code that were infected *on any given day*. *See, e.g.*, Rabinowitz Report at

5.  Accordingly, and as Dr. Burstyn himself confirmed at his deposition, the model is only capable of calculating "the likelihood that, on a given day, there was at least one entrant who *ever* became infected during [March 2020], rather than the likelihood that, during [March 2020], there was at least one entrant who was infected at the time he or she actually made an entrance onto a given [Thor] property."  *Id.* at 7; Kurzweil Decl. Ex. F ¶ 8 [hereinafter "Burstyn Reply"]; Burstyn Tr. 104:14–105:10.  The model therefore says nothing about the actual presence of SARS-CoV-2 on Thor's properties.

## III.    Professor Stempel's "Custom and Practice" Testimony

Thor also submitted an expert report from Professor Jeffrey Stempel, which claims to "describe the conceptual underpinning, history, development, operation, principles, and custom and practice of insurance, particularly 'all-risk' commercial property insurance and accompanying business interruption/business income coverage."  Kurzweil Decl. Ex. I at Intro. [hereinafter "Stempel Report"].  Professor Stempel is a career academic who has never worked as an insurance agent, broker, underwriter or adjuster, and who has never been employed in the insurance industry in any capacity.  *Id.* ¶ 1; Kurzweil Decl. Ex. K at 26:21–27:3, 28:16–24 [hereinafter "Stempel Tr."].  Professor Stempel does hold a law degree, although he has not actively practiced law for the last thirty years.  Stempel Tr. at 16:12–18:20.  Despite purporting to offer "custom and practice" testimony, Professor Stempel's report is comprised exclusively of legal opinions as to how this case should be decided and irrelevant historical commentary regarding the operation and evolution of the insurance industry and property insurance policies.

## LEGAL STANDARD

"The proponent of expert testimony carries the burden of establishing its admissibility by a preponderance of the evidence."  *Choi v. Tower Rsch. Cap. LLC*, 2 F.4th 10, 20 (2d Cir. 2021). In order to provide testimony, an expert witness must be "qualified as an expert by knowledge,

skill, experience, training, or education."  Fed. R. Evid. 702.  And even if a proposed expert is qualified to offer expert testimony on a certain subject matter, trial courts have a duty to ensure that the expert testimony is "not only relevant, but reliable."  *Daubert*, 509 U.S. at 589.  Such requirements are codified in Federal Rule of Evidence 702, which states that expert testimony is admissible only if it (a) "will help the trier of fact to understand the evidence or to determine a fact in issue," (b) "is based on sufficient facts or data," and (c) "is the product of reliable principles and methods" that (d) were "reliably applied . . . to the facts of the case."  Fed. R. Evid. 702.

While "[t]he requirement that expert testimony assist the trier of fact is 'akin to the relevance requirement of [Federal Rule of Evidence] 401,'" it "'goes beyond mere relevance . . . because it also requires expert testimony to have a valid connection to the pertinent inquiry.'"  *Atl. Specialty Ins. v. AE Outfitters Retail Co.*, 970 F. Supp. 2d 278, 284–85 (S.D.N.Y. 2013) (Gorenstein, J.) (quoting *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 540 (S.D.N.Y. 2004)).  As such, it "can be expressed as a question of 'fit'—'whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'"  *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009) (quoting *Daubert*, 509 U.S. at 591).  "Expert testimony that is not probative of a fact in issue is irrelevant and inadmissible."  *Carmichael v. City of N.Y.*, 34 F. Supp. 3d 252, 265 (E.D.N.Y. 2014) (citing *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 60 (2d Cir. 2002)).

The reliability requirement, on the other hand, ensures that "expert testimony rest on knowledge" rather than "subjective belief or unsupported speculation."  *Atl. Specialty*, 970 F. Supp. 2d at 289 (citation and quotation marks omitted).  Put simply, "Rule 702 asks the court to ensure 'that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an

expert in the relevant field.'" *Carmichael*, 34 F. Supp. 3d at 265 (quoting *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152 (1999)).

In addition, "[e]xpert testimony that usurps the role of the factfinder or that serves principally to advance legal arguments should be excluded." *Choi*, 2 F.4th at 20. The same is true of "expert testimony that expresses a legal conclusion." *Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992). And as with all testimony, even relevant and reliable expert testimony is subject to exclusion under Federal Rule of Evidence 403 "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *See, e.g.*, *Nimely v. City of N.Y.*, 414 F.3d 381, 397 (2d Cir. 2005).

## ARGUMENT

### I.   Dr. Burstyn's testimony should be excluded in its entirety under Rule 702 and *Daubert*.

Each of Dr. Burstyn's three opinions is inadmissible. Dr. Burstyn's opinion regarding the actual presence of the novel coronavirus on Thor's properties focuses on the wrong event and rests on a number of unsupported (and untrue) assumptions that render it both unreliable and irrelevant. Dr. Burstyn's remaining opinions fare no better, as they are nothing more than factual determinations readily capable of being made by a jury and are therefore not a proper subject of expert testimony. *Andrews*, 882 F.2d at 708 (holding that proffered expert testimony cannot be directed to "lay matters which a jury is capable of understanding and deciding without the expert's help"). Because all three of Dr. Burstyn's opinions suffer from critical flaws, his testimony should be excluded in its entirety. *Daubert*, 509 U.S. at 597 (instructing that courts must "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand").

A. **Dr. Burstyn's opinion regarding the alleged actual presence of SARS-CoV-2 on Thor's properties should be excluded as it fails to study the proper event and rests on a number of unsupported assumptions.**

This Court should exclude Dr. Burstyn's testimony regarding the actual presence of the novel coronavirus on Thor's properties, as the model underlying his opinion answers a different—and completely irrelevant—question. *See, e.g.*, *In re Lyman Good Dietary Supplements Litig.*, 2019 WL 5682880, at *5 (S.D.N.Y. Oct. 31, 2019) (excluding expert report addressing the wrong issue because it "is not 'tied to the facts of the case' and therefore will not aid the jury in resolving the case"). Moreover, even if the question answered by Dr. Burstyn's model were somehow relevant, his testimony would still be subject to exclusion as he fails to present a reliable methodology and instead rests his opinion on a number of untrue and unsupported assumptions. *See, e.g.*, *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 666–67 (S.D.N.Y. 2007) (excluding expert analysis that was based on an "unreliable methodology"); *Bank of N.Y. Mellon Tr. Co. v. Solstice ABS CBO II, Ltd.*, 910 F. Supp. 2d 629, 640 & n.16, 649–50 (S.D.N.Y. 2012) (collecting cases excluding expert analysis that "rests on faulty assumptions").

1. **Dr. Burstyn's model does not address the relevant question: whether the novel coronavirus was actually present on Thor's properties.**

At its core, Dr. Burstyn's model fails to address any issue relevant to this case. As detailed above, in order to establish coverage under the Policy, it is Thor's burden to show, among other things, that the novel coronavirus was present at its properties. *See supra* pp. 4–5. Thor purports to have met that burden through Dr. Burstyn's report, which concludes that there was a greater than 50% chance that someone with COVID-19 entered "at least one of" Thor's properties in New York City, San Francisco or Chicago in March 2020 (and presumably shed the virus while on premises). Burstyn Report at 2. But the model actually answers a completely different question: whether an entrant to Thor's properties in March 2020 also became infected with COVID-19 *at*

11

*some point during that month*.  Moreover, even if Dr. Burstyn's conclusion about actual presence was accurate (which it is not), a statistical model showing a 50% chance that COVID was present at a single unidentified Thor property in an unidentified one of three cities across the United States does nothing to support Thor's theory that COVID-19 was present at any *particular* property (much less *all* of them, as Thor alleges).  Because Dr. Burstyn's model fails to connect an individual's time of infection (let alone whether that individual was actually shedding the virus) to his or her time of entry or a specific Thor property, his testimony cannot possibly assist the jury in determining whether SARS-CoV-2 was actually present on Thor's properties and must therefore be excluded.  *See, e.g.*, *Atl. Specialty*, 970 F. Supp. 2d at 284–85 (holding that expert testimony must "have a valid connection to the pertinent inquiry"); *In re Fosamax*, 645 F. Supp. 2d at 173 (holding that expert testimony must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute'"); *In re Lyman*, 2019 WL 5682880, at *5 (excluding expert report that addressed the wrong issue because it "will not aid the jury in resolving the case").

In performing his analysis, Dr. Burstyn applied a statistical equation (known as a binomial formula) having two principal inputs, *n* and *P*, where *n* is the number of daily entrants to a given Thor building and *P* is the estimated risk of infection among those entrants.  *See* Burstyn Report at 3, 5 & nn.17–18; Rabinowitz Report at 3.  If *n* is an accurate representation of the number of entrants to a given building on a given day and *P* is an accurate representation of the risk of infection in those individuals on that day, then the binomial formula, properly stated, should enable one to calculate the likelihood that there was at least one individual who entered Thor's properties while infected with COVID-19.

Critically, however, Dr. Burstyn *did not* use accurate or reliable values for either *n* (as discussed in Section I.A.2, *infra*) or *P*.  Taking *P* first, as a proxy for the risk of infection among

entrants to a given Thor property, Dr. Burstyn used the adjusted[4] rate of COVID-19 infection among residents of the zip code in which that property was located.[5]  Burstyn Report at 2, 4, Ex. B.  In calculating this adjusted infection rate, Dr. Burstyn used the *cumulative* count of individuals reported to have been infected with COVID-19 during the entire month of March 2020.  *Id.* at 2–3.  But by using that cumulative count instead of the daily count of infected individuals, Dr. Burstyn ensured that the value of *P* would represent the risk that a given entrant to Thor's property became infected with COVID-19 *at some point during March 2020*, not the risk that she was infected *on the day of entry*.  *See id.* at 4 ("[W]e make no claims about the presence of infected persons on Thor's properties on any given day, but only the total over a cumulative period.").  What is more, Dr. Burstyn admitted that "[j]ust because you are infected doesn't mean you are contagious," yet his model made no attempt to ascertain the risk that an infected individual present on Thor's property would have been contagious—*i.e.*, shedding SARS-CoV-2 viral particles on the property at the time of entry.  Burstyn Tr. at 97:24–98:16, 118:3–19 ("We did not look at contagiousness of people . . . [W]e did not look at whether somebody was shedding virus, because that was not the question that we were asked to illuminate.").

---

[4] In addition to the flaws detailed herein, Dr. Burstyn's model relies on a number of unsupported assumptions in adjusting the rate of COVID-19 infection within certain geographic regions.  One such assumption was that 50% to 85% of individuals infected with SARS-CoV-2 were asymptomatic carriers of the virus (Burstyn Report at 2), an assumption that has since been refuted by the CDC, which reports that only *30%* of individuals infected with SARS-CoV-2 are asymptomatic carriers.  Burstyn Reply ¶ 4.  In addition to the systemic flaws in his model detailed herein, this significant discrepancy between real-world metrics and the variables input into his formula raises substantial concerns about the reliability and veracity of Dr. Burstyn's results.  Rabinowitz Report at 4.

[5] For example, if a building is located in the zip code 10028, Dr. Burstyn's model uses the prevalence of COVID-19 infection among residents in the zip code 10028 during March 2020 as his value of *P*.  Such methodology relies on the flawed assumption that the only entrants to such a building were those residing within the same zip code, which is discussed in greater detail in Section I.A.3, *infra*.

As a result, Dr. Burstyn's model is only capable of calculating the probability that an entrant to a given Thor building became infected with COVID-19 *sometime* during March 2020, *not* whether that individual was infected while present on a Thor property (much less shedding SARS-CoV-2 particles while present on a Thor property). *See* Rabinowitz Report at 5. Because the latter is the only question relevant to this case, Dr. Burstyn's testimony must be excluded as lacking adequate "fit." *See In re Lyman*, 2019 WL 5682880, at *5. Or, as Alexander Bickel once put it (albeit in a somewhat different context), no answer is what the wrong question begets.

Take, for example, an individual who entered a Thor building on March 1, 2020 but did not contract COVID-19 until March 30, 2020. It is undisputed that such an individual would not have been infected, and certainly was not infectious, at the time of her entry onto Thor's property. *See, e.g.*, Kurzweil Decl. Ex. H (finding "an average period of infectiousness" starting "between 2-3 days before . . . symptom onset"). Therefore, such individual's entry should be counted as an event that *did not* result in SARS-CoV-2 being present on Thor's property. But Dr. Burstyn's model reaches the opposite conclusion, treating that individual's entry as an event that *did* result in the actual presence of SARS-CoV-2 on one or more of Thor's properties. This cannot be true, meaning that Dr. Burstyn's model is fundamentally incapable of accurately estimating the likelihood that SARS-CoV-2 was present at Thor's properties during March 2020. *See, e.g.*, *City of Providence v. Bats Glob. Mkts., Inc.*, 2022 WL 902402, at *9–10 (S.D.N.Y. Mar. 28, 2022) (holding that where an expert's "methods do not differentiate between" relevant and irrelevant events, the "gap between [the expert]'s methods and conclusions is fatal to [his report's] admissibility"). That in itself compels its exclusion.

Tellingly, Dr. Burstyn does not dispute that his methodology suffers from this fatal flaw. To the contrary, Dr. Burstyn conceded at his deposition that his report makes no attempt to

14

eliminate those individuals who would not have been infected at the time of their entry. Burstyn Tr. at 96:16–97:15 ("Q. . . . Would you potentially be counting someone who had the virus on March 1st, but did not enter a Thor property until March 30th? [A.] There would be all sorts of possibilities, and this is definitely one of them. We don't know when they were infected. We don't know when they may have gone to Thor properties."). Instead, Dr. Burstyn's only response to this criticism was that FM Global "provides no alternative methodology it contends is more appropriate." Burstyn Reply ¶ 8; *see also* Burstyn Tr. at 104:14–105:10 ("Q. Do you disagree with the statement in [Dr. Rabinowitz's rebuttal report that 'The probability estimates in the Report correspond to the likelihood that, on a given day, there was at least one entrant on the property who *ever* became infected during the Period of Interest, rather than the likelihood that, during the Period of Interest, there was at least one entrant who was infected at the time he or she actually made an entrance onto a given property.']? A. Well, that's a fair description of limitation of the calculation that we performed. It's only fair in the sense that there is an alternative though, so it's a criticism.").[6] But it is Thor's burden—*not* FM Global's—to establish the actual presence of SARS-CoV-2 at Thor's properties. Accordingly, because Dr. Burstyn has failed to provide a model capable of answering that foundational question, he cannot assist the jury in determining whether Thor has carried its burden of proof, and his testimony should be excluded as irrelevant to the case at hand. *Daubert*, 509 U.S. at 597.

---

[6] Dr. Burstyn's comments are belied by his own testimony, as even he admits that there may be another methodology that could calculate the proper event, but "the data that would be required to apply that methodology was not available to [him]." Burstyn Tr. at 108:10–109:20 ("I believe that methodology exists, but the data that would be required to apply that methodology was not available to us. . . . And perhaps there is a method that I have not discovered or considered that could achieve such aim, but I do not think I could have developed and implemented in the building research here. I needed to implement it in the timeline of this case.").

2.      **Dr. Burstyn's model fails to properly estimate the number of entrants at the relevant properties.**

In addition to using an improper value for *P*, as detailed above, Dr. Burstyn's second opinion should also be excluded because he makes no attempt to use an accurate value for *n*—the number of entrants to a given Thor property on a given day—in performing his analysis.  As described in Section I.A.1, in order to accurately calculate the probability that an infected individual was present on one of Thor's properties, Dr. Burstyn must accurately estimate how many individuals were *actually present* on *each* of Thor's properties on a given day in March 2020.  *See supra* at p. 12.  But Dr. Burstyn's statistical model is devoid of any data that could have enabled him to make such an estimate.  Instead, Dr. Burstyn merely provides two separately inadmissible methodologies: one using unrealistic "what if scenarios" of 50 daily entrants and 100 daily entrants to each Thor property, and one using maximum occupancy permits for all of Thor's properties in New York City grouped together.  Burstyn Report at 5–7; Burstyn Tr. at 157:10–158:9.  Because these estimates for *n* are untethered to the facts of this case, Dr. Burstyn's testimony as to the probability that SARS-CoV-2 was present on any individual Thor property is unreliable and therefore inadmissible.  *Atl. Specialty*, 970 F. Supp. 2d at 285 ("[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony.").

As detailed above, Thor's tenants use the insured properties for a variety of purposes, including residential, office spaces, retail stores, restaurants, bars, and hotels.  Accordingly, the actual daily occupancy of each such property varies widely depending on the nature of the business and the particular circumstances of such business in March 2020.  Despite this variance, Dr. Burstyn's fails to draw *any* distinctions based on property type, instead simply assuming daily

entrants of 50 or 100 individuals to *each* tenant's property.  But such an assumption is wholly unsupported by the facts of this case and is belied by the events of March 2020.  For example, some of the properties at issue have maximum occupancies of fewer than five people.  *See* Burstyn Report Ex. D.  It therefore stretches all sense of credibility that these locations, particularly during the initial days of the pandemic, would have had 100, or even 50, daily visitors.  *See* Burstyn Tr. at 161:10–14 ("Q. . . . [I]n assuming that 50-person daily occupancy, you didn't take into account the maximum occupancy at Indochino, which is four people; is that correct?  A. That is correct.")

Again, Dr. Burstyn does not deny this flaw in his methodology.  Instead, at his deposition, Dr. Burstyn sought to distance himself from his "50 or 100" occupancy approach, explaining that these were just arbitrary values that could be used "to visualize" what the probability of an infected person being present on Thor's property "might" have been if those values were correct (which they are not).  *Id.* at 161:23–164:25 ("50 and a hundred occupancies are just to visualize what the parlance might mean.  They don't assume that 50 people entered that particular shop or any other shop.  This is an aid-in-interpretation of this possibility, which is really intangible to I think most people."), 212:15–213:3 ("Q. . . . [T]urning back  to the value of (n) here, that is the number of entrants, right, you didn't employ any sample methodology, you're not even offering an opinion on how many entrants there were to a given building, you are just giving us a tool for assuming different numbers of (n) and calculating a percentage based on that?  A. That's right.").  Because his statistical model admittedly is not based on the actual number of daily entrants to Thor's properties during March 2020, an input necessary for his statistical model to generate reliable results, Dr. Burstyn's testimony in this regard does not aid the trier of fact and must be excluded. *Atl. Specialty*, 970 F. Supp. 2d at 285 ("When presented with an expert opinion that is not sufficiently grounded in reliable facts, a court may conclude that there is simply too great an

analytical gap between the data and the opinion proffered." (internal quotation marks and alteration omitted)); *Murphy v. Gen. Elec. Co.*, 245 F. Supp. 2d 459, 467 (N.D.N.Y. 2003) (holding that expert's "report was based on insufficient data or facts" and therefore "fail[ed] to meet the requirements of Fed. R. Evid. 702").

In an attempt to avoid the obvious pitfalls associated with his use of arbitrary values for the number of daily entrants per property, Dr. Burstyn offers a second, equally implausible methodology: rather than looking at the number of entrants property by property, he uses a citywide occupancy of 5,498 persons across *all of Thor's properties* in New York City as his value for *n*, which is purportedly calculated based on maximum occupancy permits for these properties.[7] Burstyn Report at 7 & Ex. D.  As an initial matter, Dr. Burstyn's use of maximum occupancy permits is, once again, untethered to the facts of the case.  There is no reason to believe that the number on a property's maximum occupancy permit provides an accurate estimate for the number of daily entrants to that property.  Moreover, as Dr. Burstyn explained, using a citywide value for *n* "treat[s] all of Thor's landscape as one big property" and does not differentiate between one Thor building and another.   Burstyn Tr. at 167:12–168:7.  For Thor to recover under the Policy, however, it is not enough to say merely that the virus was present *somewhere*; rather, Thor must show that the virus was present *at a specific one of its properties*, and that it suffered losses because of the virus' presence at that property.

Dr. Burstyn once again does not dispute these fatal gaps in his calculations, explaining that he could only do so much with the information Thor provided to him and that he had "made

---

[7] Dr. Burstyn adjusts the maximum occupancy by assuming that the "actual average daily occupancy was only 1.5% of the maximum allowed at any point in time" (Burstyn Report at 7), but he provides no support for this percentage, particularly given the city-wide shutdowns that occurred two-thirds of the way through March 2020, which would have reduced daily occupancy to zero.

repeated efforts to find out how many people, what the occupancy patterns were." *Id.* at 57:22–58:14.  But those "repeated efforts" apparently consisted only of asking "counsel, Cohen Ziffer, to ask Thor if they had any information on flow of people, because I know that some businesses record this information . . . . I was provided with information on residency permits.  But to the best of my knowledge there is no information about flow of people on Thor properties that Thor has access to.  That was information conveyed to me." *Id.* at 58:16–59:14.[8]  By failing to connect the maximum occupancy permits to the number of real-world entrants at an individual Thor property, the conclusions from Dr. Burstyn's alternate methodology are equally irrelevant, unreliable and inadmissible.  *City of Providence*, 2022 WL 902402, at *9–10 (finding that a "gap between [the expert]'s methods and conclusions is fatal to [his report's] admissibility"); *Atl. Specialty*, 970 F. Supp. 2d at 285; *In re Fosamax*, 645 F. Supp. 2d at 173.

       None of this is to say that an appropriate methodology is not *possible*.  To the contrary, one can imagine many different ways that an expert could have attempted to ascertain the true number (or at least a remotely accurate number) of daily entrants to a given building in March 2020.  For example, Dr. Burstyn could have contacted Thor's tenants and asked if they had records of the number of entrants to their business during this time.  Indeed, Dr. Burstyn conceded that many of these tenants—which include hotels, restaurants, beauty salons, wellness centers, gyms, and

---

[8] *See also* Burstyn Tr. 62:8–63:3 ("Q. . . . [D]id you make any efforts to determine whether or not that maximum occupancy was a good proxy for actual entrances into a given set of premises at a given point in time?  A. . . . Yes, I asked for any information on actual flow of people. So, yes, I attempted it. . . . Q. Fair enough. You never came into possession of such information; is that fair?  A. Yeah.  I ain't got it."); *id.* at 63:8–22 (Q. . . . How exactly are [occupancy permits] correlated with actual occupants?  A. My presumption was that they are positively correlated; beyond that, I have no idea how strong that association would be.  Q. [Y]ou don't have any information about whether a given set of premises would be 50 percent full on a given day or 75 percent full . . . you weren't able to do that analysis, right?  A. Correct, because that would require me having information that I ain't got.").

offices—likely do keep track of entrances, either in the form of reservations, appointments, or keycard swipes.  Burstyn Tr. 109:22–110:22, 112:16–113:8.  Similarly, Dr. Burstyn could have attempted to obtain (either from the businesses themselves or from credit card companies) the number of credit card transactions that occurred at some or all of these businesses for each of the days in question.  *See id.* at 111:17–112:8 ("I believe that credit card companies collect when and where the purchase is made.").  He also could have accounted for the fact that many of these businesses were shut down in the second half of March 2020 and adjusted his assumptions accordingly.  But Dr. Burstyn did none of these things.  *See, e.g.*, *id.* at 65:8–16 ("Q.  And did you make any effort to distinguish in your analysis the period of time before the various shutdowns went into effect against the period of time after that the shutdowns went into effect, in terms of how many occupants would be likely to be in a building at a given point in time?  A.  I did not.").  Instead, Dr. Burstyn simply accepted at face value Cohen Ziffer's representation that Thor had no access to any such information.  *See id.* at 113:9–25, 115:19–117:4 ("Q.  And you didn't reach out to any of the business whose operations are located on Thor's properties; is that fair to say?  A.  That is correct.  I did not reach out to any of the businesses.  I worked with the data that counsel Cohen Ziffer provided me with . . . .").  Without making any attempt to tether his report to the real-world number of entrants to Thor's properties and by grouping all of Thor's properties together into one basket, Dr. Burstyn's report is rendered unreliable, irrelevant and inadmissible.  *See, e.g.*, *Murphy*, 245 F. Supp. 2d at 467 (holding that a report "based on insufficient data or facts . . . fails to meet the requirements of Fed. R. Evid. 702").

### 3.   Dr. Burstyn's model depends on unsupported assumptions which render its conclusions unreliable and subject to exclusion under Rule 702 and *Daubert.*

Even assuming, *arguendo*, that Dr. Burstyn had used a probability for *P* that allowed him to study the correct event and a value for *n* that was grounded in reality, his statistical model would

still suffer from a number of additional methodological flaws that render it unreliable and therefore inadmissible. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (holding that when presented with an expert opinion not sufficiently grounded in reliable facts, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered"); *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002) ("[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony."); *accord Atl. Specialty*, 970 F. Supp. 2d at 285. Specifically, Dr. Burstyn's model is based on a series of assumptions that defy both common sense and the bounds of scientific acceptability.

*First*, Dr. Burstyn's analysis improperly assumes that the only entrants to a given Thor building in March 2020 were residents of the zip code in which that building was located. Rabinowitz Report at 5; Burstyn Tr. at 170:11–17. As Dr. Burstyn conceded at his deposition, however, "we're not confined to a zip code in our daily activity," and thus, in reality, "people who visit a particular property would not be all from the same zip code as where the property is located, but would have people coming from other zip codes as well." Burstyn Tr. at 188:23–190:24.[9] Thus, to the extent entrants to a Thor property come from a different zip code with a different value of *P*, Dr. Burstyn's methodology would use an inaccurate risk of infection and would yield inaccurate results.

---

[9] Indeed, multiple buildings in Thor's portfolio are hotels, which, by definition, would be comprised almost exclusively of entrants from *outside* of the same zip code (and likely city). Dr. Burstyn's assumption "that visitors to the respective cities who are not captured in census counts of ZIP code residents are not numerous enough to meaningfully affect our calculations" (Burstyn Report at 3) is therefore entirely unrealistic and untethered to the facts of this case.

Dr. Burstyn's alternate "citywide" analysis fares no better, as it "assumes perfect mixing within the city"—*i.e.*, "that every person in New York City would have had an equal chance of entering a building in a given zip code"—an assumption which Dr. Burstyn once again conceded was unrealistic.  Burstyn Tr. at 191:19–193:2 ("Q. . . . [D]o you think it's a realistic assumption that there would have been perfect mixing in New York City in March of 2020?  A.  I don't think it is a realistic assumption at all[.]").[10]  Indeed, it defies logic to assume that someone from Queens would frequent a dry cleaner located in Manhattan.  Thus, because neither of Dr. Burstyn's methodologies are based on plausible assumptions, they are equally incapable of assisting the trier of fact in ascertaining the true likelihood that SARS-CoV-2 was present on Thor's properties, providing yet another reason why they are inadmissible as a matter of law.  *See, e.g.*, *Bank of N.Y. Mellon*, 910 F. Supp. 2d at 640 (holding that where expert's "analysis rests on faulty assumptions, the trial court has discretion to exclude his proffered testimony for lack of probative value").

*Second*, Dr. Burstyn improperly assumes that all residents of a given zip code were equally likely to enter a Thor property in that zip code in March 2020.  Burstyn Report at 2.  Among other things, this assumption ignores the basic fact that people who were sick with COVID-19 in March 2020 likely behaved differently than those who were not sick with COVID-19.  For example, it is axiomatic that an individual sick with COVID-19 in March 2020 would have been much *less* likely to travel around his or her zip-code (and the city at large) than individuals who were *not* sick with COVID-19.[11]  And, taken to its extreme, in March 2020 there were many individuals who tested

---

[10] To save his report, Dr. Burstyn attempted to claim that he was merely "provid[ing] a range of possibilities to extremes; one that people are confined to zip code and one where there is perfect mixing."  Burstyn Tr. at 192:6–10. But Dr. Burstyn's failure to accurately measure the risk of infection among entrants to a building renders his report unable to assist the trier of fact.

[11] Indeed, many individuals who were infected with COVID-19 in March 2020 were instructed to quarantine (even if asymptomatic) per CDC guidelines.  But Dr. Burstyn "did not remove them from [the] population" of potential entrants to Thor properties.  Burstyn Tr. at 228:10–17.

positive for COVID-19 and were hospitalized as a result, thus making it *impossible* for them to have entered a Thor property. But Dr. Burstyn made no effort to take any of these realities into account. Burstyn Tr. at 204:17–24 ("Q. . . . You haven't studied whether someone's status as feeling ill would have impacted their decision to enter onto a Thor property in their zip code in March of 2020, right?  A. I did not study this question, because I wasn't asked to study this question, and I'm not qualified to study this question."). [12]  Instead, Dr. Burstyn assumed that each one of these people would have been just as likely to enter a Thor property as a completely healthy individual. This assumption also underscores the unreliability of Dr. Burstyn's model. *See Bank of N.Y. Mellon*, 910 F. Supp. 2d 629, 640 & n.16, 649–50 (collecting cases).

*Third*, in addition to treating all entrants as identical, Dr. Burstyn's model improperly treats all *buildings* as identical and fails to consider how the varying characteristics of the properties that he purports to study may affect the risk of infection of the individuals entering that building. For example, it is far *more* likely that an individual sick with COVID-19 would have entered a doctor's office or a hospital in March 2020 than someone who is not infected with COVID-19. And by that same token, an individual sick with COVID-19 in March 2020 would have been far *less* likely to visit a coworking space or enjoy a night out at a bar or restaurant than someone not infected with COVID-19. But Dr. Burstyn's model does nothing to take these differences into account either. Burstyn Tr. at 205:24–206:7 ("I did not look at the type of business, I only considered how many people were allowed on premises based on occupancy permits."). Instead, Dr. Burstyn improperly assumed that the entrants to every building within a given zip code had the same risk of infection, regardless of the type of building at issue. Once again, by resting his report on this untrue and

---

[12] In addition to failing to account for an individual's infection status, Dr. Burstyn "did not look at differences in age, sex, economics, and other things," all of which could affect the likelihood of someone with COVID-19 entering a given Thor property. Burstyn Tr. 205:13–23.

unsupported assumption, particularly when combined with his other, equally unreliable assumptions, Dr. Burstyn's model is rendered unreliable and therefore inadmissible. *Bank of N.Y. Mellon*, 910 F. Supp. 2d at 640; *Atl. Specialty*, 970 F. Supp. 2d at 285

     **B.**    **Dr. Burstyn's opinions regarding stay-at-home orders and geographical mapping are not proper topics for expert testimony.**

Dr. Burstyn's remaining two opinions—that Thor's properties were subject to stay-at-home orders and were located within five miles of hospitals or nursing homes—should similarly be excluded, as they are factual determinations a jury is readily capable of making without expert assistance. Accordingly, they are impermissible subjects of expert testimony. *Andrews*, 882 F.2d at 708 (holding that proffered expert testimony cannot be directed to "lay matters which a jury is capable of understanding and deciding without the expert's help").

Dr. Burstyn's first opinion provides: "Thor's properties include locations in New York City, Chicago, Miami, and San Francisco. These cities were impacted by the COVID-19 pandemic and subject to stay-at-home orders. By the end of March 2020, all cities had enacted such orders." Burstyn Report at 2 (emphasis omitted). None of these statements are the product of any expertise, however, particularly from Dr. Burstyn. Rather, as conceded in his report, such statements are premised entirely on publicly available information regarding the location of Thor's insured properties and the timing of various government orders regarding the COVID-19 pandemic. *Id.* at 2 & n.1, 4. A jury is therefore entirely capable of understanding and deciding such issues without the assistance of Dr. Burstyn.

Dr. Burstyn's third opinion provides: "Thor's properties in New York City, Chicago, Miami, and San Francisco were located within 5 miles of a hospital or nursing home. Hospitals and nursing homes have a 'high' prevalence of COVID-19 cases on their properties due to patient care operations or risk groups." *Id.* at 2 (emphasis omitted). The first of these two statements is

once again a factual statement based solely on publicly available data. *Id.* at 8 & nn. 26–29. Accordingly, as with Dr. Burstyn's first opinion, it can be determined by a jury without the input of Dr. Burstyn.

The second sentence must also be excluded, as it is vague and not the product of reliable methods. Indeed, despite repeatedly insisting at his deposition that he "do[es] not attach adjectives to probabilities to the best of [his] ability," Dr. Burstyn claims that hospitals and nursing homes have a "high" prevalence of COVID-19 cases. *See* Burstyn Tr. at 81:12–16. And when pressed on what he meant by the word "high," Dr. Burstyn explained only that "[i]n this context I mean higher than would be found in general population." *Id.* at 233:24–234:16. But in reaching this conclusion, Dr. Burstyn expressly admitted that he did not study the prevalence of COVID-19 in any hospitals or nursing homes in New York, Chicago, or San Francisco. *Id.* at 234:24–235:8. Rather, Dr. Burstyn's relied on "reports in news media about nursing homes in New York" and "what [he] perceive[d] to be common sense that sick people would go to the hospitals, and that healthcare workers were particularly afflicted by the COVID-19 pandemic because they were treating sick patients . . . ." *Id.* at 234:9–235:12; *see also id.* at 236:19–237:5 ("It's fair to say there is no support here in the report [for] the notion that people with COVID-19 were congregating in the hospitals and nursing homes."). Accordingly, even setting aside the vague nature of Dr. Burstyn's statement, his testimony is not the product of any reliable expertise or scientific modeling and must therefore be excluded. *Andrews*, 882 F.2d at 708.

## II. Professor Stempel's purported "custom and practice" testimony should be excluded in its entirety under Rule 702, *Daubert*, and Rule 403.

As with Dr. Burstyn, the testimony of Thor's "custom and practice" expert, Professor Jeffrey Stempel, should also be excluded. It is black-letter law that proper "custom and practice" testimony must demonstrate that an ambiguous term or provision in an insurance policy has such

a "fixed and invariable usage" that the parties must have been aware of its meaning. *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*, 467 F.3d 107, 134 (2d Cir. 2006). But Professor Stempel—a career academic with no experience working in the insurance industry—provides no such testimony here. Rather, Professor Stempel's proffered opinions consist entirely of improper legal arguments, irrelevant historical background, and derogatory commentary on *other* insurers' conduct designed to taint the jury's view of FM Global. All of this must be excluded, as such testimony improperly invades the province of jury, does nothing to assist the trier of fact, and is unfairly prejudicial. *Choi*, 2 F.4th at 20; *Nimely*, 414 F.3d at 397; *see generally* Fed. R. Evid. 702.

A.   **Professor Stempel's testimony on the interpretation and application of specific Policy provisions must be excluded, as it improperly expresses legal arguments and invades the province of the jury.**

Relying on his law degree rather than his experience in the insurance industry (of which he has none), Professor Stempel's report is replete with opinions parroting Thor's legal arguments and addressing the ultimate legal conclusions at issue in this case—specifically, the interpretation and application of provisions in Thor's operative Policy. But it is black letter law that "[e]xpert testimony that usurps the role of the factfinder or that serves principally to advance legal arguments should be excluded." *Choi*, 2 F.4th at 20. On this ground, Professor Stempel's testimony must be excluded. *Id.*

For example, Professor Stempel opines in his report that the Policy "cover[s] lost revenue due to the slowdown or cessation of certain business activities resulting from direct physical loss of or damage to property" and that it "does not contain any type of virus or communicable disease exclusion that would exclude business interruption losses due to the presence or threatened presence of a virus or communicable disease." Stempel Report ¶¶ 37, 51. But these are not proper expert opinions; rather, they are Professor Stempel's view on how two of the key legal issues in this case (including one going to the case's ultimate resolution) should be decided. As such, they

26

are plainly subject to exclusion.[13]  *Hygh*, 961 F.2d at 363 (holding that "expert testimony that expresses a legal conclusion" must be excluded); *see also Am. Home Assurance Co. v. Merck & Co.*, 462 F. Supp. 2d 435, 448 (S.D.N.Y. 2006) ("[An expert]'s report clearly impinges upon the province of the Court, in so far as [the expert] essentially proffers his own version of contractual interpretation.").

Similarly, Professor Stempel's opinions that "[t]he understanding of the typical business that purchases business interruption insurance is that it has obtained broad protection not just for the costs of property damage, but also for losses due to the closure or slowdowns of the business caused by unexpected events" and that "[a] reasonable layperson looking at an exclusion denominated 'loss of market or loss of use' might understand that it barred coverage for reduction in revenue due to increased competition or altered market conditions but would never think that [the] exclusion . . . barred Time Element coverage" (Stempel Report ¶¶ 36, 57) are legal argument disguised as expert opinion.  Indeed, what understanding a "typical business" or "reasonable layperson" would have of the Policy is a determination to be made *by the jury*, not an expert.  Thus, they too are subject to exclusion.  *See, e.g.*, *Highland Cap. Mgmt., LP v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005) (excluding expert's "opinion as to the state of mind and knowledge possessed by [parties] and non-parties to this action" when entering into the relevant contract as a question for the jury).

It is for these exact reasons that Professor Stempel's opinions have been excluded time and time again by trial courts, including in near-identical contexts.  For example, in *Humans &*

---

[13] Although Professor Stempel asserts that he "[did not] intend to" offer any "opinion in this case about the correct or proper interpretation of any provision in a Factory Mutual policy" (Stempel Tr. at 141:13–17) and that "the application of the exclusion" is "an issue for the Court" to resolve (Kurzweil Decl. Ex. J ¶ 23 [hereinafter "Stempel Reply"]), even a cursory review of his report shows otherwise. *See, e.g.*, Stempel Report ¶¶ 37, 51.

*Resources,* Professor Stempel attempted to opine that the plaintiff was entitled to "coverage for business income lost due to government closure orders issued in response to the COVID-19 pandemic" because "in light of the historical context of the reasonable expectations doctrine and all-risk business insurance policies, [plaintiff]'s expectation that it was covered for 'scenarios where [his] business could be damaged' was reasonable." 2022 WL 657067, at *1, *4. But the court excluded Professor Stempel's testimony, as it went "directly to the ultimate legal conclusion—whether [plaintiff] reasonably expected that losses incurred due to government-issued closure orders were covered by the Policy." *Id.* at *4. The same was true in *Adell Plastics*, where the court excluded Professor Stempel's testimony because "legal conclusions on an ultimate issue for trial predominate Stempel's report" (2019 WL 2524916, at *3), and in *City of Phoenix*, where Professor Stempel's testimony was excluded because "[h]is report consists largely of legal opinions" including "interpretations of language in [the relevant insurance] policies." 2016 WL 4591906, at *18.

In those cases, "[r]ather than assisting the jury by providing specialized knowledge, Stempel [sought] to replace the jury entirely." *Adell Plastics*, 2019 WL 2524916, at *3. So too here. Professor Stempel should not be permitted to invade the province of the jury and offer legal argument under the guise of expert opinion. His opinions regarding the applicability (or lack thereof) of certain Policy provisions should therefore be excluded. *Choi*, 2 F.4th at 20; *Hygh*, 961 F.2d at 363; *Am. Home*, 462 F. Supp. 2d at 448.

### B. Professor Stempel's testimony on the history and development of insurance policies and the insurance industry is irrelevant.

Setting aside those portions of his report that constitute impermissible legal conclusions or invade the province of the jury, the remainder of Professor Stempel's testimony is comprised of irrelevant perspective on the historical development of insurance policies and the insurance

industry in general—facts that do nothing to assist the jury in understanding the key issues in this
case. Indeed, of the fifty-eight paragraphs in Professor Stempel's report, *forty-one* (more than
seventy percent) have absolutely nothing to do with FM Global or the terms and conditions of
Thor's Policy. Rather, they merely address irrelevant background and commentary on the
insurance industry and the evolution of property insurance policies. Stempel Report ¶¶ 1–6, 7–24,
29–36, 39–43, 47–50; *see also* Stempel Tr. at 95:8–25 (agreeing that much of his report "could
just as easily be included in a report about . . . a liability policy" and that to write much of his
report, he "didn't need to know anything about Thor or FM [Global] or its policy"). As a result,
such testimony is subject to exclusion. *See, e.g.*, *Humans & Res.*, 2022 WL 657067, at *3–4
(excluding Stempel's testimony concerning "background information on the history" of insurance
"because it would not help the trier of fact"); Fed. R. Evid. 702(a) (requiring that expert testimony
"help the trier of fact to understand the evidence or to determine a fact in issue").

On this score, the Eastern District of Pennsylvania's decision in *Humans & Resources* is
once again instructive. There, as here, Professor Stempel attempted to "offer[] a history on" the
insurance model, "provide[] background on business interruption insurance," and "explain[] the
nature of all-risk policies." *Humans & Res.*, 2022 WL 657067, at *3. But, as with his
impermissible legal testimony, the Court found that such testimony was "inadmissible because it
would not help the trier of fact." *Id.* at *4. Because Professor Stempel's testimony on the general
operation of the insurance industry and the history of all-risk policies is of no value to the jury, it
must be excluded from this case.

### C.      Professor Stempel's testimony on the operation of the insurance industry should be excluded as not only irrelevant but also unfairly prejudicial.

Professor Stempel's irrelevant testimony on the history and operation of the insurance
industry also attempts to portray insurance companies as greedy profiteers in the eyes of the jury.

Such testimony should be excluded as irrelevant and unfairly prejudicial. *See Nimely*, 414 F.3d at 397; Fed. R. Evid. 403 (prohibiting evidence that may cause "unfair prejudice" towards a party).

For example, as part of his description of the economics of insurance, Professor Stempel opines that while "[m]ost policyholders will never make a claim or will make only a small claim or two during the course of decades of buying insurance," a "well-run insurer" is able to "profit from underwriting alone and consistently profit from investment or 'float' on premium funds." Stempel Report ¶¶ 11, 21. Similarly, in his explanation of the claims handling process, Professor Stempel accuses insurers of "delaying payment of claims or seeking to 'lowball' policyholders by paying less than the full amount due under the policy" and asserts that "the prospect of large claims may cloud the judgment and corrupt the conduct of particular insurance personnel and perhaps even the entire insurance company." *Id.* ¶¶ 16, 18.[14]

But there is no claim (or evidence) that FM Global acted in bad faith or engaged in unfair claims practices (with good reason, as it did not). In fact, *none* of these paragraphs apply to (or even reference) FM Global, and Professor Stempel expressly conceded in his reply report that he "ha[s] not been asked to render an opinion on whether FM [Global] . . . has conducted itself appropriately regarding its treatment of Thor, an adjudicative issue for the Court." Stempel Reply ¶ 10; *see also* Stempel Tr. at 110:1–12 (I don't have any opinion about . . . the claims handling in this particular matter"), 114:5–12 (testifying that he did not conduct any investigation into FM Global's claims handling in this case). Thus, not only should such testimony be excluded as (admittedly) irrelevant, but it should also be excluded because it would unfairly taint the jury's

---

[14] Professor Stempel testified at deposition that he was aware "that, in some instances, insureds engage in fraud as a means of getting paid under insurance policies," but he could not provide an explanation for why this information was left out of his report's "general overview of the insurance environment." Stempel Tr. at 110:17–112:2.

view of FM Global by associating it with the alleged misconduct of unspecified insurers in unspecified cases at some unspecified time.  *See Nimely*, 414 F.3d at 397.

## **CONCLUSION**

For the reasons set forth above, the Court should grant FM Global's motion and exclude the testimony of Thor's experts Igor Burstyn, Ph.D., and Jeffrey Stempel in their entirety.


Dated: May 18, 2022                              Respectfully submitted,

                                                        */s/ Harvey Kurzweil*
                                                        Harvey Kurzweil
                                                        Kelly A. Librera
                                                        George E. Mastoris
                                                        Adam P. Moskowitz
                                                        WINSTON & STRAWN LLP
                                                        New York, NY 10166
                                                        Tel.: (212) 294-6700
                                                        Fax: (212) 294-4700
                                                        HKurzweil@winston.com
                                                        KLibrera@winston.com
                                                        GMastoris@winston.com
                                                        APMoskowitz@winston.com

                                                        Robert F. Cossolini
                                                        FINAZZO COSSOLINI O'LEARY
                                                        MEOLA & HAGER, LLC
                                                        67 East Park Place, Suite 901
                                                        Morristown, NJ 07960
                                                        Tel.: (973) 343-4960
                                                        robert.cossolini@finazzolaw.com

                                                        *Attorneys for Defendant Factory Mutual*
                                                        *Insurance Company*