UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

THOR EQUITIES, LLC,                                   :

                Plaintiff,                      :          OPINION & ORDER

     -v.-                                          :

FACTORY MUTUAL INSURANCE COMPANY, :          20 Civ. 3380 (AT) (GWG)

                      :

              Defendant.                  :
-----------------------------------------------------------------x

**GABRIEL W. GORENSTEIN, United States Magistrate Judge**

      Plaintiff Thor Equities, LLC ("Thor") has sued defendant Factory Mutual Insurance

Company ("Factory Mutual") in connection with Factory Mutual's refusal to provide insurance

coverage for COVID-19 related losses at commercial properties owned by Thor.  See Complaint,

filed Apr. 30, 2020 (Docket # 1) ("Comp.").  Factory Mutual moves to exclude the testimony of

Thor's experts, Igor Burstyn and Jeffrey Stempel.[1]  Thor moves to partially exclude the

testimony of Factory Mutual's rebuttal experts, William Way and Manish Sagar.[2]  For the reasons

explained below, Factory Mutual's motion is granted in part.  Thor's motion is granted in full.

---

[1]  Motion to Exclude Proposed Expert Testimony of Igor Burstyn, Ph.D., and Jeffrey
Stempel, filed May 18, 2022 (Docket # 128); Memorandum of Law in Support, filed May 18,
2022 (Docket # 129) ("Def. Mem."); Declaration of Harvey Kurzweil in Support, filed May 18,
2022 (Docket # 130) ("Kurzweil Decl."); Memorandum of Law in Opposition, filed June 8, 2022
(Docket # 135) ("Pl. Opp."); Reply Memorandum of Law, filed June 22, 2022 (Docket # 142)
("Def. Reply").

[2]  Motion to Partially Exclude the Testimony of Defendants' Rebuttal Experts, William
Way and Manish Sagar, filed May 18, 2022 (Docket # 125); Memorandum of Law in Support,
filed May 18, 2022 (Docket # 126) ("Pl. Mem."); Declaration of Alexander Sugzda, filed May
18, 2022 (Docket # 127) ("Sugzda Decl."); Memorandum of Law in Opposition, filed June 8,
2022 (Docket # 137) ("Def. Opp."); Declaration of Harvey Kurzweil in Opposition, filed June 8,
2022 (Docket # 138) ("Kurzweil Opp. Decl."); Reply Brief in Further Support, filed June 22,
2022 (Docket # 141) ("Pl. Reply").

I.      BACKGROUND

        A.      Facts

        As alleged in the complaint, "Thor owns commercial properties across the United States."

Id. ¶ 13.  Thor rents out these properties for use as office space, retail stores, restaurants, and

bars.  Id.  Thor's properties were insured through a commercial property insurance policy issued

by Factory Mutual.  Id. ¶ 3; see Mutual Corporation Non-Assessable Policy No. 1063282,

annexed as Ex. A to Comp. (Docket # 1-1) ("Policy").  The Policy covers Thor properties in

California, Colorado, the District of Columbia, Florida, Georgia, Illinois, Massachusetts, New

Jersey, New York, Pennsylvania, Tennessee, and Texas, see Appendix A to Policy at 1-4, and

provides coverage for property damage and various "business interruption losses," Comp. ¶ 3.  In

a number of areas, the Policy provides for a maximum per-occurrence limit of liability of $750

million, with various sublimits and time limits.  Id. ¶ 22; Policy at 3-6.  The Policy was issued on

March 15, 2020, although a materially identical policy was in effect during the prior year.  See

Comp. ¶¶ 20-21.

        In March 2020, days after the Policy was issued, proliferation of the COVID-19 virus

caused state and local governments across the United States to issue "stay-at-home orders,"

which directed the closure of non-essential businesses and prohibited non-essential gatherings.

See id. ¶¶ 14-18.  As a result, Thor's commercial properties were "shuttered," and many of

Thor's tenants were unable to pay rent.  Id. ¶ 18.  According to Thor, it has "confirmed cases of

COVID-19 at multiple properties and has had to take action to secure and preserve those

properties, and as of the filing of th[e] Complaint it has estimated that it will lose in excess of

$20 million in rental income."  Id. ¶ 19.

The Policy contains several "[a]dditional [c]overages" under the property damage section as well as "[t]ime [e]lement" coverages, also called business interruption coverages.  See Comp. ¶¶ 25-52.  These coverages include a "COMMUNICABLE DISEASE RESPONSE" provision and an "INTERRUPTION BY COMMUNICABLE DISEASE" provision (the "Communicable Disease Provisions"), which together have a $1 million limit on liability.  Policy at 4, 6, 23, 55-56.  The Policy covers losses from the interruption of Thor's business, including loss of rental income; loss caused by restriction of access to Thor's property, including where a loss is caused by an order issued by a civil or military authority; loss caused by loss or damage to property near Thor's insured locations that attracts business to Thor's properties; loss caused by delay in startup to properties under construction; loss caused by physical loss or damage at the property of suppliers or customers; and extra expenses incurred to continue business as nearly normal as practicable.  See id. at 41, 49, 51-52, 54-55.  Other than the Communicable Disease Provisions, which require a showing of "the actual not suspected presence" of a communicable disease, all provisions invoked by Thor require proof of physical loss or damage at the insured property — except for the civil or military authority coverage, which requires physical loss or damage within five miles of the insured property.  See id. at 23, 49-57.  The Policy also contains various exclusions, including a contamination exclusion and a loss of market or loss of use exclusion. Policy at 11-12, 15, 67.

In April 2020, Thor sought coverage in connection with its COVID-19 related losses and informed Factory Mutual that "Thor's claim would greatly exceed the Policy's $1 million sublimit for the communicable disease coverages."  Comp. ¶ 53.  Factory Mutual responded that it understood Thor's claim as one "submitted under the Policy's ADDITIONAL COVERAGES for COMMUN[I]CABLE DISEASE RESPONSE and INTERRUPTION BY

COMMUNICABLE DISEASE." Id. ¶ 54.  Thor asserts that "[b]y focusing solely on the

communicable disease coverages . . . [Factory Mutual] sent a clear message that it was not

prepared to consider Thor's significant costs and losses under any of the Policy's other

coverages." Id. ¶ 55.  In other words, Thor indicated that any coverage offered by Factory

Mutual would be subject to the $1 million limit.  Thus, Thor initiated the instant action for

anticipatory breach of contract and a declaratory judgment. Id. at 14-16.

      B.    <u>Prior Decision</u>

Before discovery concluded, the parties filed motions for judgment on the pleadings

regarding "the applicability and scope of the Contamination Exclusion and the Loss of Market or

Loss of Use Exclusions." Thor Equities, LLC v. Factory Mut. Ins. Co., 531 F. Supp. 3d 802, 806

(S.D.N.Y. 2021).  On March 31, 2021, the district court denied both motions, reasoning that the

contamination exclusion was ambiguous and that the Court could not determine the application

of the other exclusions because the record was not sufficiently developed. Id. at 809-10.

II.    <u>LEGAL STANDARD</u>

"The district court's determination whether to admit expert testimony is guided by Fed.

R. Evid. 702." United States v. Gatto, 986 F.3d 104, 117 (2d Cir. 2021).  Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill,
> experience, training, or education may testify in the form of an
> opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other
> > specialized knowledge will help the trier of fact to
> > understand the evidence or to determine a fact in
> > issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles
> > and methods; and

(d) the expert has reliably applied the principles and
methods to the facts of the case.

Fed. R. Evid. 702.

The Rule 702 standard incorporates the principles enunciated in Daubert v. Merrell Dow
Pharmaceuticals, Inc., 509 U.S. 579, 589, 597 (1993), in which the Supreme Court held that trial
courts have a "gatekeeping" function to "ensure that any and all scientific testimony or evidence
admitted is not only relevant, but reliable," and Kumho Tire Co. v. Carmichael, 526 U.S. 137
(1999), in which the Supreme Court held that Daubert's general gatekeeping obligation "applies
not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical'
and 'other specialized' knowledge." Id. at 141 (citing Fed. R. Evid. 702).

"One of the fundamental requirements of Rule 702 is that the proposed testimony 'assist
the trier of fact to understand the evidence or to determine a fact in issue.'" In re Rezulin Prods.
Liab. Litig., 309 F. Supp. 2d 531, 540 (S.D.N.Y. 2004) (quoting Fed. R. Evid. 702); accord U.S.
Sec. & Exch. Comm'n v. Collector's Coffee Inc., 552 F. Supp. 3d 427, 430 (S.D.N.Y. 2021); see
also In re Initial Pub. Offering Sec. Litig., 174 F. Supp. 2d 61, 68 (S.D.N.Y. 2001) ("As Rule
702's plain language shows, the opinion of an expert witness is only admissible if it (1) assists
the trier of fact in (2) understanding the evidence or determining a disputed fact." (emphasis in
original)).  In deciding whether expert testimony will be helpful to the factfinder, the Court must
ensure that the testimony does not "usurp either the role of the trial judge in instructing the jury
as to the applicable law or the role of the jury in applying that law to the facts before it." United
States v. Lumpkin, 192 F.3d 280, 289 (2d Cir. 1999) (quoting United States v. Duncan, 42 F.3d
97, 101 (2d Cir. 1994)); see also United States v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1991).
In addition, expert testimony is inadmissible when it addresses "lay matters which a jury is

capable of understanding and deciding without the expert's help." <u>Andrews v. Metro N.</u>

<u>Commuter R.R.</u>, 882 F.2d 705, 708 (2d Cir. 1989) (citing cases).

Moreover, as with all testimony, the expert's testimony must actually be relevant to an

issue in the case.  <u>See</u>, <u>e.g.</u>, <u>United States v. Cruz</u>, 363 F.3d 187, 192 (2d Cir. 2004).  Thus, as

part of the Rule 702 analysis, a court must "analyz[e] whether [the] proffered expert testimony is

relevant, i.e., whether it has any tendency to make the existence of any fact that is of

consequence to the determination of the action more probable or less probable than it would be

without the evidence." <u>Amorgianos v. Nat'l R.R. Passenger Corp.</u>, 303 F.3d 256, 265 (2d Cir.

2002) (punctuation omitted); <u>see</u> <u>also</u> Fed. R. Evid. 401.

"The decision to admit expert testimony is left to the broad discretion of the trial judge."

<u>Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC</u>, 571 F.3d 206, 213 (2d Cir. 2009).

"The proponent of expert testimony carries the burden of establishing its admissibility by a

preponderance of the evidence." <u>Choi v. Tower Rsch. Cap. LLC</u>, 2 F.4th 10, 20 (2d Cir. 2021).

III.   <u>FACTORY MUTUAL'S MOTION TO EXCLUDE</u>

Factory Mutual seeks to exclude all testimony from Thor experts Igor Burstyn and Jeffrey

Stempel.[3]  <u>See</u> Def. Mem. at 10, 25.  We discuss each separately.

A.   <u>Burstyn's Expert Opinion</u>

1. <u>Background</u>

Burstyn is a professor of environmental and occupational health with experience in

epidemiology.  <u>See</u> Expert Witness Report of Igor Burstyn, annexed as Ex. D to Kurzweil Decl.

(Docket # 130-4) ("Burstyn Report"), at 1.  Burstyn submitted an expert report purporting to

---

[3]  Burstyn's report indicates it was co-written with Neal Goldstein.  However, because
Burstyn apparently is the person who would testify at trial, <u>see</u> Def. Mem. at 1 n.1, we refer to
the report and testimony at issue as that of Burstyn.

opine on the presence of COVID-19 at Thor's properties during March 2020.  See id. at 2.

Separately, Burstyn gave his views that New York, Chicago, Miami, and San Francisco "were

impacted by the COVID-19 pandemic and stay-at-home orders," which were enacted in all four

cities by the end of March 2020.  Id.  He also created maps indicating the proximity of Thor's

properties to healthcare facilities, including hospitals and nursing homes.  Id. at 8; Ex. E to

Burstyn Report.

    Burstyn's report concluded that there was a greater than 50% chance that a person

infected with COVID-19 entered at least one of Thor's properties in March 2020.  See Burstyn

Report at 2.  Burstyn did not attempt to identify any specific instances where a COVID-19

infected individual was present at a Thor property.  See id. at 4.  Rather, Burstyn "calculated

the . . . prevalence of [COVID-19] both citywide and by ZIP code under various assumptions

about surveillance accuracy" for March 2020.  Id.  Then, Burstyn "use[d] these prevalence rates

to calculate the probability that an individual who entered Thor's properties may have been

infected with [COVID-19] under various assumptions about occupancy."  Id.

    For example, Burstyn gave his estimate of COVID-19 prevalence under a "worst-case

scenario" of errors in COVID-19 "surveillance" (the term used to describe the estimate of

COVID-19's presence in the population), where 40% of positive individuals receive false

negative results, 0.1% of negative persons receive false positives, and 85% of infections are

asymptomatic.  Id. at 4.  Under this scenario, a ZIP-code with 8,806 residents and 66 positive

COVID-19 diagnoses in March 2020 would be deemed to have a 1.57% prevalence of infection,

and the probability that a person present on a Thor property in that ZIP-code was infected would

also be 1.57%.  See id. at 4-5.  As such, assuming a particular Thor property in that ZIP-code had

an average daily occupancy of 50 or 100 persons (or alternatively, assuming the number of

occupants in a particular Thor property each day equaled the maximum occupancy permitted in

that building at any given time) and that all persons in the ZIP-code were equally likely to enter

the property, Burstyn purported to calculate the probability that at least one infected person

entered the property in March 2020.  See id. at 4-6.  Burstyn's "citywide" estimates used

COVID-19 data for the entirety of New York City, Chicago, and San Francisco rather than using

data by ZIP-code.  The citywide estimates assumed that all persons throughout a respective city

were equally likely to enter a Thor property and assumed that the number of daily visitors to all

Thor properties in a respective city was equal to the total persons allowed on all such premises at

any point in time.  See id. at 4-5, 7-8.

       Defendants submitted an expert report authored by Daniel Rabinowitz, a professor of

statistics.  See Expert Rebuttal Report of Daniel Rabinowitz, annexed as Ex. E to Kurzweil Decl.

(Docket # 130-5) ("Rabinowitz Report").  Rabinowitz opined that Burstyn's methodology failed

to capture persons who were infected with COVID-19 while at Thor properties but rather was

structured to determine whether persons who were present at Thor properties in March 2020

contracted COVID-19 at some point during the month of March 2020.  See id. at 2, 5.  Indeed, as

Rabinowitz pointed out, Burstyn's formula used "the cumulative number of individuals ever to

be recorded as symptomatic and infected in the zip code throughout [March 2020] rather than the

reported number of symptomatic infected individuals per day."  Id. at 5.  Rabinowitz also

attacked Burstyn's assumptions regarding, inter alia, surveillance accuracy, the nature and

identity of entrants to Thor properties (that entrants were solely residents of the ZIP-code in

which the building was located and that patterns of entry at Thor properties were identical for

infected and non-infected persons), and the number of daily entrants to Thor properties

(arbitrarily selected numbers of 50 and 100, or the maximum building occupancy where

available).  See id. at 4-6.

Burstyn submitted a rebuttal report responding to various critiques lodged by Rabinowitz.

See Response of Igor Burstyn, annexed as Ex. F to Kurzweil Decl. (Docket # 130-6) ("Burstyn

Reply").  As to Rabinowtiz's assertion that Burstyn's formula in fact measured whether persons

who were present at Thor properties in March 2020 contracted COVID-19 at some point during

that month even if it was after their entry on a Thor property, Burstyn contended that Rabinowitz

"provides no alternative methodology [he] contends is more appropriate," insisting that

> [i]f a person became infected during [March 2020] and had
> potential to enter a Thor property, then there is a non-zero
> likelihood that they could have entered Thor property before they
> were diagnosed and/or quarantined and/or self-isolated.  It is
> common for epidemiologist[s] to assume that some risk factors are
> equally likely to be present among persons who share time and
> place, which is exactly the reasoning that I employed.

Id. 7-8.  Burstyn defended his methodology as relying on the prevailing practice among

epidemiologists.  See id. at 1-2, 5.

2    Analysis

Factory Mutual objects to Burstyn's report on the basis that its opinions regarding the

presence of COVID-19 at Thor properties fail to satisfy the requirements of Daubert and Rule

702, and that its opinions regarding stay-at-home orders and geographical mapping are neither

helpful to the jury nor the product of specialized knowledge.  See Def. Mem. at 10-25; Def.

Reply at 3-14.  We address each aspect of the report separately.

a.    Presence of COVID-19

Factory Mutual's argument that the opinion regarding the presence of COVID-19 must be

excluded rests on three points: (1) that Burstyn's model does not address a question relevant to

this case inasmuch as it measures only whether persons who were present at Thor properties in

March 2020 contracted COVID-19 at some point during that month, see Def. Mem. at 11-15; (2) that the model does not properly estimate the number of people entering Thor's properties on a given day, see id. at 16-20; and (3) that the model depends on improper assumptions; specifically, that (a) the only entrants to a Thor property in March 2020 were residents of the ZIP-code in which the respective properties were located; (b) that all residents of a particular ZIP-code were equally likely to enter a Thor property located therein in March 2020; and (c) that all Thor buildings are identical insofar as there is no variation in their characteristics that might affect whether entrants are more or less likely to be infected with COVID-19, see id. at 20-23. Because we agree with the first point, we do not address Factory Mutual's other arguments.

As with lay testimony, expert testimony must be relevant to be admitted.  See Amorgianos, 303 F.3d at 265; accord Tchatat v. City of New York, 315 F.R.D. 441, 444 (S.D.N.Y. 2016).  Under Fed. R. Evid. 401, "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."

An expert's statistical analysis is generally not irrelevant merely because it fails to account for all variables that might impact the expert's conclusion.  See Bazemore v. Friday, 478 U.S. 385, 400 (1986) (concurrence in part joined by all Justices).  Where the expert's analysis accounts for all "major factors," the failure to include additional variables "will affect the analysis' probativeness, not its admissibility."  Id.  However, some analyses may be "so incomplete as to be inadmissible as irrelevant."  Id. at 400 n.10; accord Bickerstaff v. Vassar Coll., 196 F.3d 435, 449 (2d Cir. 1999).  If a "major factor" is unaccounted for, exclusion may be justified.  Bazemore, 478 U.S. at 400 n.10; accord Coward v. ADT Sec. Sys. Inc., 140 F.3d 271,

274 (D.C. Cir. 1998).  Whether a variable is a "major factor" depends on "the facts and theory of the particular case."  Coward, 140 F.3d at 274.

To be relevant under Fed. R. Civ. P. 401, Burstyn's analysis must tend to make it more probable than not that there was an "actual . . . presence" (to use the Policy language) of a "communicable disease" — here, COVID-19 — at a Thor property during March 2020.  The parties appear to agree that this showing can be satisfied through proof that an individual who had COVID-19 was present on the Thor property.  The problem with Burstyn's analysis is that it instead provides data on the issue of whether an individual who entered a Thor property in March 2020 contracted COVID-19 at some point during the month of March 2020.  In other words, Burstyn's analysis lumps together persons who actually contracted COVID-19 in March 2020 before entering a Thor property with persons who did not have COVID-19 at all while on the property but who contracted COVID-19 at some other time during the month of March.

Thor frames Factory Mutual's objection as being that "Burstyn's opinion does not conclusively establish the actual presence of [COVID-19] on Thor's properties."  Pl. Opp. at 8.  Certainly, an expert's statistical analysis is not inadmissible simply because it fails to "conclusively" establish a disputed fact inasmuch as statistical analyses are never definitive descriptions of what actually took place.  But as Factory Mutual points out, it does not argue that Burstyn must conclusively show that a particular person infected with COVID-19 entered a Thor property on a particular date.  Rather, its contention is that Burstyn offers no means to differentiate between infected persons who contracted COVID-19 before visiting a Thor property, or afterwards.  See Def. Reply at 4-5.[4]

_____

[4] Factory Mutual at one point states that Burstyn's model is deficient also because it fails to ascertain the risk that an infected individual on Thor's property was "shedding SARS-CoV-2 virus particles on the property at the time of entry."  Def. Mem. at 13; see also id. at 22

Thor does not dispute Factory Mutual's core assertion: that by using COVID-19 case data for the entire month of March cumulatively rather than considering the daily case count, Burstyn's model measures whether persons who were present at Thor properties in March 2020 contracted COVID-19 at some point during that month and not necessarily while they were on Thor properties.  See Pl. Opp. at 8 ("Burstyn's analysis . . . assesses the likelihood a person infected with COVID-19 during the month of March 2020 entered Thor's properties").  In fact, Burstyn's reply report essentially admits as much, referring one point to his model encompassing a person who "became infected during [March 2020] and had potential to enter a Thor property." Burstyn Reply at 7-8.  Burstyn states that there is a "non-zero likelihood" that such a person "could have entered Thor property before they were diagnosed and/or quarantined and/or self-isolated."  Id.  Nonetheless, at his deposition Burstyn admitted that his analysis was ultimately not capable of identifying whether a person was infected before or after they entered a Thor property.  See Deposition of Igor Burstyn, annexed as Ex. G to Kurzweil Decl. (Docket # 130-7) ("Burstyn Tr."), 104-06 (admitting that Rabinowitz's critique is "a fair description of [the] limitation of the calculation that [Burstyn] performed" but asserting that there was no available alternative methodology).

It is thus undisputed that Burstyn includes in his analysis persons who contracted COVID-19 later in March after entering a Thor property, failing to differentiate between such persons and persons who contracted COVID-19 prior to entering a Thor property.  This is equivalent to an unaccounted for "major factor[]" under Bazemore.  Thus, Burstyn's model

_____

(suggesting that the "trier of fact" would be required to "ascertain[] the true likelihood that SARS-CoV-2 was present on Thor's properties") (emphasis added).  Thor makes no further argument on this question and repeatedly addresses only the issue of whether persons infected with COVID-19 were on the property, regardless of whether they were shedding virus or were contagious.  Thus, we do not address this statement further.

simply does not determine the question it purports to solve — whether COVID-19 was present at Thor properties. Burstyn's analysis is therefore so incomplete that it lacks relevance. <u>See</u> <u>Bazemore</u>, 478 U.S. at 400 n.10.

Thor argues that there is no mechanism by which to identify all persons who contracted COVID-19 at specific times and isolate them. <u>See</u> Pl. Opp. at 10-11. But it is not defendant's burden to provide Burstyn with a viable methodology; rather, the burden is on Thor.

Thor argues that Burstyn's methodology is peer-reviewed and consistent with prevailing practice among epidemiologists. <u>See</u> Pl. Opp. at 9; <u>see also</u> Burstyn Reply at 1-2, 5, 7-8. But this is not quite correct. But the peer-reviewed models referenced by Thor were models to fix COVID-19 case counts. <u>See</u> Burstyn Tr. at 42-45. They were not designed to pinpoint the presence of COVID-19 at specific locations.

The cases Thor cites in its opposition brief do not compel a different result. <u>See</u> Thor Opp. at 10-11 (citing <u>In re Teva Secs. Litig.</u>, 2021 WL 872156, at *38-39 (D. Conn. Mar. 9, 2021); <u>Duling v. Gristede's Operating Corp.</u>, 267 F.R.D. 86, 94-95 (S.D.N.Y. 2010); <u>Royal &</u> <u>Sun Alliance Ins. PLC v. UPS Suppl Chain Sols., Inc.</u>, 2011 WL 3874878, at *9 (S.D.N.Y. Aug. 31, 2011)). Each is highly fact-specific, analyzing expert testimony of a character different from what is presented here. Two cases concluded that the objections lodged were issues of weight, rather than admissibility. <u>See</u> <u>Duling</u>, 267 F.R.D. at 95; <u>Royal & Sun</u>, 2011 WL 3874878, at *9. Another found that the expert in question ultimately "has not failed to consider vitally important information." <u>Teva</u>, 2021 WL 872156, at *39. None of these cases undermine the Supreme Court's holding in <u>Bazemore</u>, 478 U.S. at 400, or otherwise call into doubt our application of that standard here.

Accordingly, Burstyn's opinions and analysis regarding the presence of COVID-19 at

Thor properties in March 2020 are excluded.

        b.       <u>Opinions Regarding Stay-at-Home Orders and Prevalence of COVID-19 at Nursing Homes or Hospitals</u>

Factory Mutual objects to Burstyn's remaining opinions on the ground that they are

neither helpful to the jury nor the product of specialized knowledge.  <u>See</u> Def. Mem. at 24-25;

Def. Reply at 12-14.  The two statements at issue are that (1) New York City, Chicago, Miami,

and San Francisco "were impacted by the COVID-19 pandemic and subject to stay-at-home

orders [and by] the end of March 2020, all cities had enacted such orders"; and (2) "Thor's

properties in New York City, Chicago, Miami and San Francisco were located within 5 miles of a

hospital or nursing home" and "[h]ospitals and nursing homes have a 'high' prevalence of

COVID-19 cases on their properties due to patient care operations or risk groups."  Burstyn

Report at 2.

Factory Mutual does not at this stage argue that Burstyn's statement regarding the stay-at-

home orders is not relevant.  Instead, it suggests that it is a "factual determination[] a jury is

readily capable of making without expert assistance," Def. Mem. at 24, and that the "jury can

determine for itself" this matter, Def. Reply at 13.

It is unclear, however, how Factory Mutual believes a jury should be supplied the

information about past stay-at-home orders except through an individual who compiles such

information.  And the Second Circuit has made clear that experts may in some instances give

testimony about historical events that are within their expertise.  <u>See</u>, <u>e.g.</u>, <u>Marvel Characters,</u>

<u>Inc. v. Kirby</u>, 726 F.3d 119, 135-36 (2d Cir. 2013).  Here, given Burstyn's expertise in

epidemiology and infectious diseases, he is an appropriate witness to provide to the jury a

compilation of stay-at-home orders and to testify as to their existence as they would be understood by an expert in the field of epidemiology.

As to the prevalence of COVID-19 in hospitals and nursing homes, Burstyn's use of the term "high" to describe that prevalence is impermissibly vague and thus unhelpful to the jury. But more problematically, Thor has not established that Burstyn has a proper basis from which to opine on the prevalence of COVID-19 at hospitals and nursing homes.  Thor points to Burstyn's deposition to contend that Burstyn "spoke with public health frontline responders" and argues that Burstyn thus "has ample foundation for the position that hospitals and nursing homes have a high prevalence of COVID-19 cases."  Pl. Opp. at 22 (citing Burstyn Tr. 149).  But there is nothing in the cited portion of Burstyn's deposition transcript reflecting that Burstyn spoke with "public health frontline responders" about the prevalence of COVID-19 at hospitals or nursing homes.  See Burstyn Tr. 149.  In fact, Burstyn at his deposition admitted that he did not specifically study the prevalence of COVID-19 at any hospitals or nursing homes in New York, Chicago, or San Francisco.  See id. at 234-35, 241.  Rather, Burstyn read "reports in news media about nursing homes in New York."  Id. at 235.  There is no suggestion, however, that the use of reports in news media represents the application of "principles and methods" of epidemiology or that his testimony is the product of "reliable principles and methods."  Fed. R. Evid. 702.  Thus, this statement must be excluded.  In light of this exclusion, the issue of whether to allow Burstyn to testify regarding the location of such facilities is necessarily moot.

c.    Conclusion

Accordingly, Factory Mutual's request to exclude Burstyn's opinions is granted, except that he may testify as to the issuance of stay-at-home orders in March 2020.

B.      Stempel's Expert Report

Stempel is a law professor with expertise in insurance law, history, and industry practices. See Report of Jeffrey Stempel, annexed as Ex. I to Kurzweil Decl. (Docket # 130-9) ("Stempel Report") ¶¶ 1-4.  Stempel has submitted an expert report containing six substantive sections, which are entitled "The Insurance Business Model," "Insurance Coverage for Fortuitous Events," "The Evolution of Property Insurance and Business Interruption Coverage," "All-Risk Policies and the Distinction from Specified Perils Property Insurance," "Contamination, Pollution, and Virus Exclusions," and "Exclusions for Loss of Market/Loss of Use."  Id. at 4, 6-7, 9-11.  Thor characterizes the report as focusing on "the history and development of key coverages and provisions, including the development of the exclusions at issue here in the industry, and foundational testimony regarding property and business interruption insurance." Pl. Mem. at 3.

Factory Mutual objects to Stempel's Report on the basis that it offers impermissible legal conclusions, and on the grounds that its discussion of industry custom is irrelevant, and in certain instances, unfairly prejudicial.  See Def. Mem. at 25-31; Def. Reply at 14-17.

1.      Legal Conclusions

Thor insists that "Stempel's opinions . . . do not opine one way or another whether there is, in fact, coverage under the" Policy.  Pl. Opp. at 23.  Instead, Thor maintains that Stempel's opinions "focus on the history of the coverages at issue here."  Id.  In fact, at various points in his report, Stempel opines on what the Policy covers.  See Stempel Report ¶ 37 ("Consistent with industry custom, Thor's policies cover lost revenue due to the slowdown or cessation of certain business activities resulting from direct physical loss of or damage to property."); id. ¶ 51 ("Based on the historical development of these exclusions and industry custom, FM's decision

not to include any type of virus or communicable disease exclusion applicable to the

policyholder's losses evidences that losses due to viruses or communicable disease were

intended to be covered by Thor's all-risk policy."); id. ¶¶ 54-58 (interpreting of "loss of use"

exclusion by reference to policy arguments, semantic structure, the expectations of a reasonable

person, and the "longstanding tenet of insurance policy construction" that "exclusions . . . are

construed narrowly and against the insurer").  An expert witness, however, is barred from giving

"testimony on issues of law."  Bilzerian, 926 F.2d at 1294; accord Navigators Ins. Co. v. Goyard,

Inc., 2022 WL 2205596, at *4-5 (S.D.N.Y. June 21, 2022), reconsideration denied, 2022 WL

3568238 (S.D.N.Y. Aug. 19, 2022).  Accordingly, any of Stempel's conclusions as to what the

policy covers are not admissible.

### 2. Custom and Usage Testimony

The remainder of Stempel's Report — and indeed the vast majority — consists of

Stempel's recounting, as Thor puts it, of "the history and development of key coverages and

provisions, including the development of the exclusions at issue here in the industry, and

foundational testimony regarding property and business interruption insurance."  Pl. Opp. at 3.

While Thor boldly asserts that these topics are "at the heart of this case," id. at 22, Thor never

persuasively explains why Stempel's proffered expertise on these topics is appropriately

considered by the jury.

Thor characterizes Stempel's Report as "admissible custom and practice expert

testimony" id. at 23, and cites to a number of cases admitting such testimony, including

numerous out-of-district cases in which Stempel's testimony on customs and practices in the

insurance field was admitted, see id. at 23-24.  Thor states categorically that "custom and

practice testimony is relevant in insurance recovery lawsuits," id. at 26, and then suggests that

there is "particular[]" relevance "where at least one policy provision has already been deemed ambiguous by the Court," id. at 26.

Thor never directly states what that policy provision is, but Thor apparently is alluding to the district court's denial of judgment on the pleadings on the ground that the contamination clause was ambiguous.  See Thor, 531 F. Supp. 3d at 809.  It is certainly permissible for an expert to provide testimony on custom and usage in the industry as to an ambiguous term.  See, e.g., Christiana Gen. Ins. Corp. of N.Y. v. Great Am. Ins. Co., 979 F.2d 268, 274 (2d Cir. 1992) ("[W]hen the terms of the contract . . . are ambiguous, as here, reference to extrinsic evidence provides guidance to the parties' intent.  Such extrinsic evidence may in appropriate cases include industry custom and practice." (internal citation omitted)).  But Stempel's Report fails to adhere to the requirements of such testimony.

First, Stempel's Report does not itself actually home in on any particular term that is contended to be potentially ambiguous and explain why custom and practice elucidates the meaning of that term.  Instead, the Report discusses the various coverages in the Policy generally, giving a history of those coverages in the insurance industry.

Second, and as a result, Stempel's Report does not meet the evidentiary standards for the admission of expert testimony on custom and practice.  As the Second Circuit has noted, "[u]nder New York law, evidence of custom and usage must establish that (1) the term in question has a 'fixed and invariable' usage and (2) that the party sought to be bound was aware of the custom, or that the custom's existence was 'so notorious' that it should have been aware of it."  SR Int'l Bus. Ins. Co. v. World Trade Ctr. Properties, LLC, 467 F.3d 107, 134 (2d Cir. 2006) (citation and internal quotation marks omitted).  "The trade usage must be 'so well settled, so uniformly acted upon, and so long continued as to raise a fair presumption that it was known to

both contracting parties and that they contracted in reference thereto.'"  British Int'l Ins. Co. v. Seguros La Republica, S.A., 342 F.3d 78, 84 (2d Cir. 2003).

Stempel's Report does not fulfill these requirements as to any particular term in the Policy, and Thor does not even make any argument that it does so.  With respect to the contamination exclusions, Stempel essentially admits that there is no "fixed and invariable usage" in the insurance industry, conceding that the language of these exclusions "varies considerably across policies."  Reply Report of Jeffrey Stempel, annexed as Ex. J to Kurzweil Decl. (Docket # 130-10), ¶ 21.  Although Stempel broadly refers to the historical development of various provisions and types of policies, see Stempel Report ¶¶ 29-35, 39-43, 47-50, the admission of custom or usage evidence requires more precision.  A party offering such evidence must use it to illuminate the meaning of a specific, potentially ambiguous contractual term; not merely to argue, as Stempel does, that the inclusion or exclusion of certain types of provisions in an insurance contract is consistent or inconsistent with industry practice.

While the Second Circuit has upheld the admission testimony on custom and practice in the insurance industry, see SR Int'l, 467 F.3d at 134-37, Thor has not pointed to any case where it has done so except in instances where there is a need to interpret a specific ambiguous term in a contract.  Thus, in SR Int'l, evidence of "trade usage" was found admissible to determine the meaning of two "undefined" terms in an insurance policy (the terms "occurrence" and "event").  Id.

We will not address the reasoning of the various out-of-district cases that admitted Stempel's testimony, some of which do not give a clear explanation of relevance, except to note that Thor's citation to Dominion Resources SVC, Inc. v. Alstom Power, Inc., 2018 WL 3752878 (D. Conn. Aug. 8, 2018) — the only case cited within this Circuit that admitted Stempel's

testimony — is unavailing.  That case involved a dispute over what was meant by an insured's request to its agent to obtain a "commercial general liability insurance" policy.  Id. at *1-2, *4-7. Thus, <u>Dominion</u> involved a situation where expert testimony was admissible to illuminate the meaning of a specific, ambiguous term.  See <u>id.</u> at *6 ("By providing an opinion on the customary meaning of 'commercial general liability insurance' in the market as a whole, [Stempel's] opinion [will] assist the trier of fact in determining a factual issue that is actually in dispute").

In sum, Factory Mutual's motion to exclude Stempel's testimony is granted.

IV.   <u>THOR'S MOTION TO PARTIALLY EXCLUDE</u>

Thor seeks to exclude certain testimony from Factory Mutual experts William Way and Manish Sagar.

A.   <u>Way</u>

We need not address Thor's argument regarding the alleged infirmities in Way's report, <u>see</u> Expert Rebuttal Report of William Serviss Way, annexed as Ex. 1 to Sugzda Decl. (Docket # 127-1), because Factory Mutual offered Way's testimony only to rebut Stempel's testimony pursuant to Fed. R. Civ. P. 26(a)(2)(D)(ii) and concedes that Way's rebuttal testimony is unnecessary to the extent Stempel's underlying testimony is excluded.  See Def. Opp. at 2; <u>see generally</u> <u>Sec. & Exch. Comm'n v. Mudd</u>, 2016 WL 2593980, at *7 n.14 (S.D.N.Y. May 4, 2016); ("Because [plaintiff's experts'] reports and testimony have been excluded in their entirety, [defendant's expert's] rebuttal is no longer necessary or relevant.").

B.   <u>Sagar</u>

Sagar is a professor of medicine who specializes in internal medicine and infectious diseases and characterizes himself as an "internationally recognized virologist."  <u>See</u> Expert

Report of Manish Sagar, annexed as Ex. 3 to Sugzda Decl. (Docket # 127-3) ("Sagar Report"), at

1.  Sagar has submitted a report explaining the physical characteristics of SARS-CoV-2, the virus

that causes the disease commonly known as COVID-19; how the virus is transmitted; how it may

be destroyed or mitigated; and the prevalence of infections.  See id. at 2-7.  Included in Sagar's

report is the following paragraph:

> SARS-CoV-2 cannot grow on inanimate materials.  For instance, buildings can
> suffer permanent damage from mold infestation, which, unlike viruses, can
> reproduce and grow by digesting organic materials present in buildings.  There is
> no evidence that any virus, including SARS-CoV-2, can generate progeny by
> utilizing organic material commonly present in buildings.  Thus, based on this
> evidence, the presence of the virus on a surface does not physically alter the
> property in a manner that requires its repair or replacement.

Id. at 3.[5]

Thor seeks to exclude only the last sentence of this paragraph.  See Pl. Mem. at 8; Pl.

Reply at 7.  In this paragraph and elsewhere in the report, Sagar discusses how the virus interacts

with surfaces, including whether it can grow or reproduce on inanimate materials.  For example,

Sagar opines that the presence of COVID-19 on inanimate surfaces can be eliminated by

cleaning those surfaces.  See id. ¶¶ 4(d), 18.  While Thor intends to dispute at trial the "assertion

that simple or routine cleaning [is] in any way sufficient to remediate the presence of" COVID-

19, it does not ask that the Court exclude any of these opinions.  Pl. Reply at 7.  Instead, Thor

seeks to exclude only Sagar's opinion that "the presence of [COVID-19] on a surface does

not . . . require[] [the surface's] repair or replacement."  Sagar Report at 3; see Pl. Reply at 7.

To support its position, Thor argues that Sagar's opinion regarding "repair or

replacement" is not based "on any specialized or technical knowledge that will assist the trier of

fact" but rather relies on a "'common sense' determination."  Pl. Mem. at 8.  As Thor notes,

---

[5]  A similar statement is contained in the summary section of the report.  See id. at 2.

Sagar even admitted at a deposition that this particular conclusion was based on "common sense."  Deposition of Manish Sagar, annexed as Ex. B to Kurzweil Opp. Decl. (Docket # 138-2) ("Sagar Tr."), 28.  Thor makes much of this admission its brief, citing to numerous cases that hold that common sense is not an appropriate basis for an expert opinion under Fed. R. Evid. 702.  See Pl. Mem. at 9; see, e.g., In re Mirena IUD Prods. Liab. Litig., 169 F. Supp. 3d 396, 484 (S.D.N.Y. 2016) ("If [the expert's] opinion is based on simple common sense, it is not helpful; the jury does not need expert opinion because its common sense will suffice.").

Tellingly, Factory Mutual's opposition does meaningfully address Sagar's admission regarding "common sense."  Instead, Factory Mutual points to other statements in the report and deposition that might allow for the inference that there was a "scientific explanation" for the statement.  Def. Opp. at 6.  But the only "scientific explanation" Factory Mutual points to is ultimately the explanation contained in the paragraph of the Report that is itself at issue: that is, the notion that the virus does not digest organic materials and cannot reproduce by using materials commonly present in buildings.  This description of the virus certainly might lead to a common sense conclusion that it is not necessary to repair or replace surfaces where the virus was present.  But in the absence of any explanation of whether issues regarding "repair" or "replacement" of building materials are within Sagar's scientific expertise, we cannot say that Sagar has provided a basis for this particular statement under Fed. R. Civ. P. 702, which requires that a showing be made that an expert's "testimony is based on sufficient facts or data" that is also the "product of reliable principles and methods."

Certainly, where a particular phrase carries a recognized meaning in an expert's field, the expert may offer an opinion based on his or her understanding and application of that term.  But neither Sagar's report nor his deposition testimony establishes that the terms "repair" or

"replacement" carry a particular meaning in the field of virology, which is Sagar's area of

expertise.  Factory Mutual points to Sagar's over twenty years of experience working in

laboratory settings "where [he or his colleagues have] spill[ed] virus on a surface," and simply

cleaned off the viral material.  Def. Opp. at 8 (citing Sagar Tr. 27, 74-75).  This experience

qualifies Sagar to opine on what methods are sufficient to rid a surface of a virus such as

COVID-19 and on what is done in laboratory settings where a virus has been spilled on an

inanimate surface.  However, in the absence of a clear definition of "repair" or "replacement," or

some testimony as to those meanings in the scientific community, Sagar's testimony on this point

is not sufficiently supported to be admissible.

Accordingly, Thor's request to exclude the Sagar's opinion that "the presence of the

[SARS-CoV-2,] on a surface does . . . not require [the surface's] repair or replacement," Sagar

Report at 3, is granted.

V.      CONCLUSION

For the foregoing reasons, Factory Mutual's Motion to Exclude (Docket # 128) is granted

in part and denied in part as stated above.  Thor's Motion to Partially Exclude (Docket # 125) is

granted in full.

SO ORDERED.

Dated:  September 13, 2022
        New York, New York


GABRIEL W. GORENSTEIN
United States Magistrate Judge