**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
———————————————————————— x
                                :
THOR EQUITIES, LLC,             :
                                :
              Plaintiff,        :
                                :   Case No. 20-cv-3380-AT-GWG
       v.                       :
                                :
FACTORY MUTUAL INSURANCE        :
COMPANY,                        :
                                :
              Defendant.        :
                                :
———————————————————————— x
```

**DEFENDANT FACTORY MUTUAL INSURANCE COMPANY'S RULE 56.1**
**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF**
**ITS MOTION FOR SUMMARY JUDGMENT**

**Introduction:**

Defendant Factory Mutual Insurance Company ("FM Global"), pursuant to Local Civil

Rule 56.1, hereby submits this Statement of Undisputed Material Facts in Support of its Motion

for Summary Judgment that, as a matter of law, (1) Plaintiff Thor Equities, LLC ("Thor") cannot

demonstrate "physical loss or damage" to its insured properties, (2) the provisions of Thor's

operative Policy, including but not limited to the Contamination and Loss of Use Exclusions,

exclude coverage related to the COVID-19 pandemic other than that potentially provided by the

Policy's Communicable Disease Response and Interruption by Communicable Disease provisions,

and (3) Thor has not demonstrated the necessary prerequisites to recover any of its alleged damages

under the Policy's Communicable Disease Response and Interruption by Communicable Disease

provisions.

Because the Policy provisions at issue are clear and unambiguous, FM Global does not

believe that extrinsic or parol evidence is relevant or necessary to resolve the issues identified

above. *W.W.W. Assocs. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990). Nevertheless, FM

Global has included herein such undisputed evidence—which uniformly and overwhelmingly supports FM Global's reading of the Policy—in the event the Court determines that it is appropriate for resolution of FM Global's anticipated summary judgment motion.

**Response:**

I.      **The Parties**

1.      FM Global is a mutual insurance company and is owned entirely by its policyholders.  *Mutual Ownership – Mutual Gain*, FM Global, https://www.fmglobal.com.au/about-us/why-fm-global/mutual-ownership-mutual-gain (last visited Sept. 14, 2022).  Declaration of Harvey Kurzweil ("Kurzweil Decl.") Ex. 1.

**Response:**

2.      FM Global is incorporated in Rhode Island and has its principal place of business in Rhode Island.  ECF No. 1 ¶ 10.

**Response:**

3.      Thor is a real estate company with interests in commercial properties across the United States and around the world.  ECF No. 1 ¶ 2.

**Response:**

4.      Thor is organized under the laws of Delaware and has its principal place of business in New York, New York.  ECF No. 1 ¶ 9.

**Response:**

5.      Thor does not own any of the properties at issue in this matter; rather, Thor manages some of those properties and receives a fee for its management services.  Kurzweil Decl. Ex. 2, Def.'s Ex. 070 at THOR0012564; Kurzweil Decl. Ex. 3, Ricca Tr. at 15:8–12, 17:6–16, 264:2–16.

**Response:**

6.      The tenants who rent properties in Thor's portfolio use them for a variety of purposes, including residential, office spaces, retail stores, restaurants, bars, and hotels.  ECF No. 1 ¶ 13; Kurzweil Decl. Ex. 4, D'Ambrosio Tr. at 36:17–37:16.

**Response:**

**II.    Overview of SARS-CoV-2, COVID-19, and the COVID-19 Pandemic**

7.      SARS-CoV-2 is a virus.  Kurzweil Decl. Ex. 5, Pl.'s Resp. to RFA No. 1; Kurzweil Decl. Ex. 6, Lessler Ex. 2 ¶ 11; Kurzweil Decl. Ex. 7, Sagar Report ¶ 5.

**Response:**

8.      COVID-19 is a disease.  Kurzweil Decl. Ex. 5, Pl.'s Resp. to RFA No. 2; Kurzweil Decl. Ex. 6, Lessler Ex. 2 ¶ 11; Kurzweil Decl. Ex. 7, Sagar Report ¶ 5.

**Response:**

9.      The SARS-CoV-2 virus causes the disease COVID-19.  Kurzweil Decl. Ex. 5, Pl.'s Resp. to RFA No. 2; Kurzweil Decl. Ex. 6, Lessler Ex. 2 ¶ 11; Kurzweil Decl. Ex. 7, Sagar Report ¶ 5.

**Response:**

10.     The SARS-CoV-2 virus is transmitted between humans.  Kurzweil Decl. Ex. 6, Lessler Ex. 2 ¶ 13; Kurzweil Decl. Ex. 7, Sagar Report ¶ 11.

**Response:**

11.     The primary means of SARS-CoV-2 virus transmission is through inhalation of infectious virus particles in respiratory droplets.  Kurzweil Decl. Ex. 6, Lessler Ex. 2 ¶ 13, 50; Kurzweil Decl. Ex. 7, Sagar Report ¶ 4b; Kurzweil Decl. Ex. 8, Lessler Ex. 3 ¶ 2.

**Response:**

12.     An individual may be infected with COVID-19 but not be shedding infectious SARS-CoV-2 viral particles.  Kurzweil Decl. Ex. 9, Lessler Tr. at 114:10–25.

**Response:**

13.     When an individual infected with COVID-19 does shed infectious SARS-CoV-2 virus particles, shedding "peaks around one day before symptom onset and declines within a week of symptom onset, with an average period of infectiousness and risk of transmission between 2-3 days before and 8 days after symptom onset."  *Ending Isolation*, Ctrs. for Disease Control & Prevention  (Jan.  14,  2022),  https://www.cdc.gov/coronavirus/2019-ncov/hcp/duration-isolation.html.  Kurzweil Decl. Ex. 10.

**Response:**

14.     SARS-CoV-2 virus particles contained in aerosols naturally die within 3 hours. Kurzweil Decl. Ex. 6, Lessler Ex. 2 ¶ 41.

**Response:**

15.     Infectious SARS-CoV-2 virus particles contained in droplets decrease 90% within 10 minutes after air exposure.  Kurzweil Decl. Ex. 7, Sagar Report ¶ 12.

**Response:**

16.     Larger droplets containing SARS-CoV-2 virus particles settle out of the air and fall to ground within seconds to minutes.  Kurzweil Decl. Ex. 7, Sagar Report ¶ 12.

**Response:**

17.     Finer droplets and aerosol particles containing SARS-CoV-2 virus particles settle out of the air and fall to ground within minutes to hours.  Kurzweil Decl. Ex. 7, Sagar Report ¶ 12.

**Response:**

18.     When deposited onto common surfaces such as plastic, glass, stainless steel, copper, banknotes, cardboard, and paper, SARS-CoV-2 naturally dies within hours to days. Kurzweil Decl. Ex. 6, Lessler Ex. 2 ¶¶ 40, 42–45.

**Response:**

19.     Standard disinfecting cleaning products successfully deactivate the SARS-CoV-2 virus within 15 to 30 seconds.  Kurzweil Decl. Ex. 6, Lessler Ex. 2 ¶ 16.

**Response:**

20.     The EPA has published a 138-page list of 599 commercially available products that can be used on surfaces to kill the SARS-CoV-2 virus.  Kurzweil Decl. Ex. 11, Lessler Ex. 4.

**Response:**

21.     SARS-CoV-2 cannot digest, degrade, or otherwise physically alter the materials commonly present in buildings such as plastic, wood, metal, glass, brick, and concrete.  Kurzweil Decl. Ex. 7, Sagar Report ¶¶ 4d, 7.

**Response:**

22.     SARS-CoV-2 cannot reproduce or grow on inanimate materials.  Kurzweil Decl. Ex. 9, Lessler Tr. at 46:2–23.

**Response:**

23.     Thor's virology expert, Dr. Justin Lessler, testified that he agreed with the statement that "COVID-19 is harmful to people, not to buildings."  Kurzweil Decl. Ex. 9, Lessler Tr. at 109:4–14.

**Response:**

24.    COVID-19 was first detected in Wuhan, China in December 2019.  *COVID-19 Timeline*, Ctrs. for Disease Control & Prevention (Jan. 5, 2022), https://www.cdc.gov/museum/timeline/covid19.html.  Kurzweil Decl. Ex. 12.

**Response:**

25.    On January 20, 2020, the CDC confirmed the first laboratory-confirmed case of COVID-19 in the United States.  *COVID-19 Timeline*, Ctrs. for Disease Control & Prevention (Jan. 5, 2022), https://www.cdc.gov/museum/timeline/covid19.html.  Kurzweil Decl. Ex. 12.

**Response:**

26.    On January 31, 2020, the World Health Organization and the U.S. Secretary of Health and Human Services declared the coronavirus outbreak a public health emergency.  *COVID-19 Timeline*, Ctrs. for Disease Control & Prevention (Jan. 5, 2022), https://www.cdc.gov/museum/timeline/covid19.html.  Kurzweil Decl. Ex. 12.

**Response:**

27.    On March 7, 2020, New York Governor Andrew Cuomo declared a disaster emergency for the State of New York due to COVID-19.  Kurzweil Decl. Ex. 13 at THOR0002970.

**Response:**

28.    On March 9, 2020, Illinois Governor JB Pritzker declared a state of emergency for the State of Illinois due to COVID-19.  Gubernatorial Disaster Proclamation (Mar. 9, 2020), https://www.illinois.gov/content/dam/soi/en/web/coronavirus/documents/coronavirus-disaster-proc-03-12-2020.pdf.  Kurzweil Decl. Ex. 14.

**Response:**

29.    On March 9, 2020, Florida Governor Ron DeSantis declared a state of emergency for the State of Florida due to COVID-19.  Kurzweil Decl. Ex. 15 at THOR0000408.

**Response:**

30.    On March 11, 2020, the World Health Organization declared COVID-19 a pandemic. *COVID-19 Timeline*, Ctrs. for Disease Control & Prevention (Jan. 5, 2022), https://www.cdc.gov/museum/timeline/covid19.html.  Kurzweil Decl. Ex. 12.

**Response:**

31.    On March 13, 2020, President Donald Trump declared a nationwide emergency for COVID-19.  Proclamation No. 9994, 85 Fed. Reg. 15337 (Mar. 13, 2020).  Kurzweil Decl. Ex. 16.

**Response:**

32.    On March 20, 2020, New York Governor Andrew Cuomo signed the "New York State on PAUSE" Executive Order which ordered the closure of all non-essential businesses statewide.  Kurzweil Decl. Ex. 17 at THOR0002990.

**Response:**

33.    On March 20, 2020, Illinois Governor JB Pritzker signed a statewide stay-at-home order which ordered the closure of all non-essential businesses statewide.  Kurzweil Decl. Ex. 18 at THOR0002110.

**Response:**

34.    On April 1, 2020, Florida Governor Ron DeSantis signed a statewide stay-at-home order which ordered the closure of all non-essential businesses statewide.  Kurzweil Decl. Ex. 19 at THOR0000472.

**Response:**

35.    Thor Executive Vice President Danielle D'Ambrosio testified that none of the New York orders prevented physical entrance or exit to any of Thor's buildings.  Kurzweil Decl. Ex. 4, D'Ambrosio Tr. at 323:13–324:11.

**Response:**

36.    Danielle D'Ambrosio testified that Thor closed the James Hotel in March or April 2020 "because there was no occupancy" and Thor was losing money; the James Hotel was closed "independently of" any government orders or COVID-related restrictions.  Kurzweil Decl. Ex. 4, D'Ambrosio Tr. at 106:13–109:5, 115:16–118:11.

**Response:**

37.    Danielle D'Ambrosio testified that the Palmer House Hotel was closed in April 2020 due to low occupancy and the resulting loss of revenue, not due to any government orders or COVID-related restrictions.  Kurzweil Decl. Ex. 4, D'Ambrosio Tr. at 134:10–136:4.

**Response:**

38.    Danielle D'Ambrosio testified that physical access to the Palmer House was never prohibited or prevented by government order.  Kurzweil Decl. Ex. 4, D'Ambrosio Tr. at 136:5–16.

**Response:**

III.    **Thor's Relationship with FM Global**

39.    FM Global began insuring Thor's properties in 2008.  Kurzweil Decl. Ex. 20, Henriquez Tr. at 17:21–18:1; Kurzweil Decl. Ex. 21, Rudnick Tr. at 23:23–24:4.

**Response:**

40.    Thor's Director of Risk Management, Raizy Berkowitz, was in charge of obtaining and overseeing property insurance for Thor and was Thor's representative in negotiations with FM Global.  Kurzweil Decl. Ex. 22, Berkowitz Tr. at 64:13–16, 153:5–14.

**Response:**

41.     From March 15, 2019 to March 15, 2020, FM Global insured Thor under policy no. 1050440.  ECF No. 1 ¶ 21.

**Response:**

42.     On March 13, 2020, Thor renewed its policy with FM Global for a 12-month term, effective from March 15, 2020 to March 15, 2021, under policy no. 1063282 (the "Policy").  ECF No. 1 ¶¶ 3, 20; ECF No. 1-1.

**Response:**

43.     In connection with its purchase and negotiation of the Policy, Thor was represented by the brokerage firm Northeast Series of Lockton Companies, LLC ("Lockton").  Kurzweil Decl. Ex. 23, Pl.'s Resp. to 2d ROG No. 10; Kurzweil Decl. Ex. 22, Berkowitz Tr. at 71:14–22.

**Response:**

44.     Lockton negotiated on Thor's behalf with FM Global and had actual authority to do so.  Kurzweil Decl. Ex. 23, Pl.'s Resp. to 2d ROG No. 10; Kurzweil Decl. Ex. 24, Def.'s Ex. 021; Kurzweil Decl. Ex. 22, Berkowitz Tr. at 85:25–86:20; Kurzweil Decl. Ex. 25, Brandt Tr. at 26:12–16.

**Response:**

45.     Lockton provided Thor with various services under its Services Agreement with Thor, which was in effect from March 15, 2019 to March 15, 2021 and which expressly authorized Lockton to, among other things: "[a]nalyze proposals when received and present coverage alternatives/options to [Thor]"; "[a]nalyze renewal proposals and present renewal options to [Thor]"; "[a]nswer [Thor's] questions and provide research or advice as needed"; "[c]onduct renewal process with existing insurance carriers"; "[e]valuate the competitiveness of current insurance premium pricing and rate levels"; "[o]btain competitive proposals for [Thor] where

necessary," and "[r]eview coverage terms."  Kurzweil Decl. Ex. 24, Def.'s Ex. 021; Kurzweil Decl. Ex. 22, Berkowitz Tr. at 78:12–79:4; Kurzweil Decl. Ex. 25, Brandt Tr. at 37:16–38:7.

**Response:**

46.    In exchange for Lockton's services, Thor paid Lockton $155,000 annually. Kurzweil Decl. Ex. 24, Def.'s Ex. 021; Kurzweil Decl. Ex. 25, Brandt Tr. at 37:2–15.

**Response:**

47.    David Brandt, a Senior Account Manager at Lockton with six years of experience as a licensed insurance broker in the State of New York, was the Lockton representative in charge of placing Thor's property insurance.  Kurzweil Decl. Ex. 25, Brandt Tr. at 18:2–8, 21:11–13, 26:7–11, 160:14–18.

**Response:**

48.    David Brandt testified that he is "an expert compared to the general public when it comes to terms, conditions and policies" in the property insurance industry.  Kurzweil Decl. Ex. 25, Brandt Tr. at 170:17–19.

**Response:**

49.    David Brandt served as Thor's agent, "negotiat[ing] with insurance companies to provide the broadest possible terms at the cheapest price for [Thor]."  Kurzweil Decl. Ex. 25, Brandt Tr. at 26:12–16.

**Response:**

50.    Thor's risk manager, Raizy Berkowitz, "trusted Lockton's advice."  Kurzweil Decl. Ex. 22, Berkowitz Tr. at 74:18–20.

**Response:**

51.    In connection with placing Thor's 2020 property insurance, Lockton engaged in a "full marketing program," sending Thor's risk profile "to all the insurance carriers you would think of" in order to "see what the best deal is available."  Kurzweil Decl. Ex. 25, Brandt Tr. at 43:12–44:4.

**Response:**

52.    David Brandt testified that Lockton was aware of COVID-19 at the time he was working on Thor's 2020 property insurance renewal and that he "made sure [Thor] got the best insurance they could, especially considering COVID."  Kurzweil Decl. Ex. 25, Brandt Tr. at 92:12–22.

**Response:**

53.    Liberty Mutual and FM Global "were the two finalists in the 2020 [to] 2021 time period in terms of property policy" for Thor.  Kurzweil Decl. Ex. 22, Berkowitz Tr. at 84:6–9.

**Response:**

54.    According to Lockton, Liberty Mutual was the only insurer that "was able to offer terms at pricing & coverage terms required to compete with FM [Global]."  Kurzweil Decl. Ex. 26, Def.'s Ex. 032 at THOR0010370.

**Response:**

55.    Liberty Mutual offered a quote with a lower premium than FM Global but both Craig Barnet and David Brandt felt that Liberty Mutual's policy had certain "coverage deficiencies" when compared to the FM Global Policy.  Kurzweil Decl. Ex. 27, Def.'s Ex. 027; Kurzweil Decl. Ex. 26, Def.'s Ex. 032; Kurzweil Decl. Ex. 28, Barnet Tr. at 73:2–74:3.

**Response:**

56.    One difference between the FM Global Policy and the Liberty Mutual policy was that the Liberty Mutual policy excluded coverage for communicable disease entirely while the FM Global Policy provided $1 million of communicable disease coverage.  Kurzweil Decl. Ex. 26, Def.'s Ex. 032 at THOR0010375; Kurzweil Decl. Ex. 22, Berkowitz Tr. at 175:20–176:22.

**Response:**

57.    The Liberty Mutual policy excluded coverage for "Contamination, and any cost due to contamination including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy, except as provided elsewhere in this Policy."  Kurzweil Decl. Ex. 29, Def.'s Ex. 028 at LOCKTON0012712.

**Response:**

58.    The Liberty Mutual policy defined "Contamination" as "Any condition of property that results from a contaminant" and defined "Contaminant" as "Any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, fungus, mold or mildew."  Kurzweil Decl. Ex. 29, Def.'s Ex. 028 at LOCKTON0012748.

**Response:**

59.    The fact that the Liberty Mutual policy had a "complete virus exclusion" while the FM Global Policy contained $1 million in communicable disease coverage was a factor that "made the FM policy a better selection" for Thor.  Kurzweil Decl. Ex. 28, Barnet Tr. at 78:17–79:7.

**Response:**

60.    Raizy Berkowitz explained to Thor's Founder and CEO, Joseph Sitt, that "Liberty was the only viable alternative option to FM Global and they were excluding virus coverage." Kurzweil Decl. Ex. 30, Def.'s Ex. 088.

**Response:**

61.    In connection with its negotiation and purchase of the Policy, Thor was also advised by MSG Consulting Inc. ("MSG"), a third-party insurance consultant.  Kurzweil Decl. Ex. 22, Berkowitz Tr. at 80:3–83:17; Kurzweil Decl. Ex. 23, Pl.'s Resp. to 2d ROG No. 10.

**Response:**

62.    MSG helped Thor "review the terms and conditions" of the FM Global Policy and compare them with proposals Thor received from other insurers during the renewal of Thor's property insurance policy in March of 2020.  Kurzweil Decl. Ex. 22, Berkowitz Tr. at 83:2–17.

**Response:**

63.    MSG provided Thor with the various services listed in MSG's Engagement Letter with Thor, which was in effect from July 1, 2019 to July 1, 2020 and which stated that MSG would, among other things, "perform a comprehensive review and analysis of ***Thor's*** current insurance policies and provide a written audit for each"; "work together with ***Thor's*** internal risk manager to develop appropriate underwriting information for targeted areas of coverage"; "evaluate the adequacy of current limits and deductibles that exist across all lines of the insurance program and recommend alternatives where appropriate"; "negotiate with brokers and direct writing insurers, including reinsurers if required, using our technical abilities and marketing knowledge to achieve a comprehensive program as directed by ***Thor***"; "analyze all proposals submitted and review them with you and your insurance management team so that you can make informed policy and coverage selections"; and "meet with ***Thor*** on an as needed basis to discuss ways to improve coverages." Kurzweil Decl. Ex. 31, Def.'s Ex. 071 (emphasis in original); Kurzweil Decl. Ex. 28, Barnet Tr. at 32:23–41:2.

**Response:**

64.    The MSG Engagement Letter stated that, in exchange for the services provided by MSG, Thor would pay MSG $120,000.  Kurzweil Decl. Ex. 31, Def.'s Ex. 071.

**Response:**

65.    MSG principals Stephen Gerber and Craig Barnet were assigned to service Thor's account.  Kurzweil Decl. Ex. 31, Def.'s Ex. 071; Kurzweil Decl. Ex. 28, Barnet Tr. at 23:17–24:6.

**Response:**

66.    Craig Barnet is a Certified Insurance Counselor with more than 25 years of experience in the property insurance industry.  Kurzweil Decl. Ex. 32, Def.'s Ex. 092; Kurzweil Decl. Ex. 33, Def.'s Ex. 094; Kurzweil Decl. Ex. 28, Barnet Tr. at 19:13–25, 43:21–44:6.

**Response:**

67.    Raizy Berkowitz testified that she trusted and relied upon the advice she received from MSG—and specifically Mr. Barnet and Mr. Gerber—with regard to the Policy.  Kurzweil Decl. Ex. 22, Berkowitz Tr. at 80:3–25.

**Response:**

68.    According to Danielle D'Ambrosio, MSG is an "insurance expert[]" and its role was to "act[] as a consultant for" Thor's risk manager Raizy Berkowitz, helping to "work through difficult situations or situations that Ms. Berkowitz didn't have expertise in."  Kurzweil Decl. Ex. 4, D'Ambrosio Tr. at 56:9–25.

**Response:**

69.    In a March 13, 2020 email, Craig Barnet told Raizy Berkowitz that it "[w]ould be insanity not to" bind coverage with FM Global.  Kurzweil Decl. Ex. 34, Def.'s Ex. 082.

**Response:**

70.     Craig Barnet later explained to Raizy Berkowitz and Thor's Chief Operating Officer, Melissa Gliatta, that by the time Thor entered into the Policy "the pandemic was in full swing," "[t]he only other option [Thor] received was offered by Liberty and contained a total virus exclusion," and "[s]ecuring increased limits for virus coverage in the midst of a pandemic was unfortunately not possible." Kurzweil Decl. Ex. 35, Def.'s Ex. 087.

**Response:**

71.     Stephen Gerber similarly explained to Joseph Sitt that Thor's 2020 "property renewal unfortunately came up in mid-March when the pandemic was a known event," that under New York law FM Global was "obligated to continue to provide $1,000,000 of specific BI coverage for virus, but they were able to maintain their virus exclusion," and that "[n]o other insurance carrier was willing to provide virus coverage due to the timing of the renewal." Kurzweil Decl. Ex. 36, Def.'s Ex. 089.

**Response:**

## IV.     Relevant Policy Terms

### A.  General Policy Framework

72.     The Policy insures "against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded," at certain named properties. ECF No. 1-1 at 10.[1]

**Response:**

73.     The Policy's Schedule of Locations lists all of the properties that are insured under the Policy. ECF No. 1-1 at 81–84.

**Response:**

---

[1] References to page numbers in ECF No. 1-1 are to the file-stamped ECF page numbers at the top of each page.

74.     The Policy includes coverage for certain property damage and time element losses. ECF No. 1-1 at 19, 45.

**Response:**

75.     The Policy, by its terms, excludes coverage under a number of circumstances.  ECF No. 1-1 at 20–24.

**Response:**

76.     The Policy's "exclusions apply unless otherwise stated."  ECF No. 1-1 at 20.

**Response:**

77.     In other words, the exclusions from coverage are subject to certain exceptions to those exclusions, which add back in coverage where it otherwise would have been excluded. Kurzweil Decl. Ex. 37, Reed Tr. at 99:16–100:4.

**Response:**

78.     The Policy's maximum limit of liability is $750 million, but it also contains various lower limits of liability, including a maximum limit of liability for combined coverage under the Communicable Disease Response and Interruption By Communicable Disease provisions, which are subject to a $1 million aggregate sublimit.  ECF No. 1-1 at 12–15.

**Response:**

**B. Relevant Policy Coverages**

79.     The Policy "insures TIME ELEMENT loss, as provided in the TIME ELEMENT COVERAGES, directly resulting from physical loss or damage of the type insured."  ECF No. 1-1 at 45.

**Response:**

80.    "The Policy also insures TIME ELEMENT loss . . . for the TIME ELEMENT

COVERAGE EXTENSIONS."  ECF No. 1-1 at 56.

**Response:**

81.    Among the TIME ELEMENT COVERAGE EXTENSIONS are Civil or Miliary

Authority, Contingent Time Element Extended, Ingress/Egress, Logistics Extra Cost, Attraction

Property, Delay in Startup, and Protection and Preservation of Property.  ECF No. 1-1 at 8.

**Response:**

82.    The Policy's Civil or Miliary Authority provision provides:

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE
incurred by the Insured during the PERIOD OF LIABILITY if an order of
civil or military authority limits, restricts or prohibits partial or total access
to an insured **location** provided such order is the direct result of physical
damage of the type insured at the insured **location** or within five statute
miles/eight kilometres of it.

ECF No. 1-1 at 58 (emphasis in original).

**Response:**

83.    The Policy's Contingent Time Element Extended provision provides:

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE
incurred by the Insured during the PERIOD OF LIABILITY directly
resulting from physical loss or damage of the type insured to property of the
type insured at **contingent time element locations** located within the
TERRITORY of this Policy.

ECF No. 1-1 at 59 (emphasis in original).

**Response:**

84.    The Policy's Ingress/Egress provision provides:

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE
incurred by the Insured during the PERIOD OF LIABILITY due to the
necessary interruption of the Insured's business due to partial or total
physical prevention of ingress to or egress from an insured **location**,
whether or not the premises or property of the Insured is damaged, provided

17

that such prevention is a direct result of physical damage of the type insured to property of the type insured.

ECF No. 1-1 at 59–60 (emphasis in original).

**Response:**

85.     The Policy's Logistics Extra Cost provision provides:

This Policy covers the extra cost incurred by the Insured during the PERIOD OF LIABILITY due to the disruption of the **normal** movement of goods or materials: 1) directly between insured **locations**; or 2) directly between an insured **location** and a **location** of a direct customer, supplier, contract manufacturer or contract service provider to the Insured, provided that such disruption is a direct result of physical loss or damage of the type insured to property of the type insured located within the TERRITORY of this Policy.

ECF No. 1-1 at 60–61 (emphasis in original).

**Response:**

86.     The Policy's Attraction Property provision provides:

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY directly resulting from physical loss or damage of the type insured to property of the type insured that attracts business to an insured **location** and is within 1 statute mile/1.6 kilometres of the insured **location**.

ECF No. 1-1 at 63 (emphasis in original).

**Response:**

87.     The Policy's Delay In Startup provision provides:

GROSS EARNINGS or GROSS PROFIT and EXTRA EXPENSE are extended to cover the Actual Loss Sustained incurred by the Insured during the PERIOD OF LIABILITY due to the reasonable and necessary delay in startup of business operations directly resulting from physical loss or damage of the type insured to insured property under construction at an insured **location**.

ECF No. 1-1 at 64 (emphasis in original).

**Response:**

88.     The Policy's Protection and Preservation of Property provision provides:

> This Policy covers the Actual Loss Sustained by the Insured for a period of time not to exceed 48 hours prior to and 48 hours after the Insured first taking reasonable action for the temporary protection and preservation of property insured by this Policy provided such action is necessary to prevent immediately impending insured physical loss or damage to such insured property.

> ECF No. 1-1 at 66.

**Response:**

89.     Unless "otherwise provided under any TIME ELEMENT COVERAGE EXTENSION," the "PERIOD OF LIABILITY applying to all TIME ELEMENT COVERAGES" begins at "the time of physical loss or damage of the type insured" and ends "when with due diligence and dispatch" the physical loss and/or damage "could be . . . repaired or replaced" and the property "made ready for operations, under the same or equivalent physical and operating conditions that existed prior to the damage."  ECF No. 1-1 at 52–53.

**Response:**

### C. Relevant Policy Exclusions

90.     The Policy excludes coverage for "loss of market or loss of use" (the "Loss of Use Exclusion").  ECF No. 1-1 at 20–21.

**Response:**

91.     Unless "directly resulting from other physical damage not excluded," the Policy also excludes coverage for "**contamination**, and any cost due to **contamination** including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy.  If **contamination** due only to the actual not suspected presence of **contaminant(s)** directly results from other physical damage not excluded by this Policy, then only physical damage

caused by such **contamination** may be insured" (the "Contamination Exclusion").  ECF No. 1-1 at 24 (emphasis in original).

**Response:**

92.    The Policy defines "contaminant" as "anything that causes **contamination**."  ECF No. 1-1 at 75 (emphasis in original).

**Response:**

93.    The Policy defines "contamination" as "any condition of property due to the actual or suspected presence of any foreign substance, impurity, pollutant, hazardous material, poison, toxin, pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, fungus, mold or mildew."  ECF No. 1-1 at 76.

**Response:**

94.    The Policy also excludes coverage for "loss from enforcement of any law or ordinance . . . regulating the construction, repair, replacement, use or removal, including debris removal, of any property . . . except as provided by the DECONTAMINATION COSTS and LAW AND ORDINANCE coverages of this Policy."  ECF No. 1-1 at 20–21.

**Response:**

### D. Communicable Disease Coverages

95.    The Policy contains two coverages specifically related to "communicable disease": Communicable Disease Response and Interruption By Communicable Disease.  ECF No. 1-1 at 7–9.

**Response:**

96.    The Policy defines "communicable disease" as "disease which is . . . transmissible from human to human by direct or indirect contact with an affected individual or the individual's discharges, or . . . Legionellosis."  ECF No. 1-1 at 75.

**Response:**

97.    Communicable Disease Response coverage is an Additional Coverage under the Policy.  ECF No. 1-1 at 7.

**Response:**

98.    The Policy's Communicable Disease Response provision provides:

> If a **location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such **location** is limited, restricted or prohibited by:
>
> 1)  an order of an authorized governmental agency regulating the actual not suspected presence of **communicable disease**; or
>
> 2)  a decision of an Officer of the Insured as a result of the actual not suspected presence of **communicable disease**,
>
> this Policy covers the reasonable and necessary costs incurred by the Insured at such **location** with the actual not suspected presence of **communicable disease** for the:
>
> 1)  cleanup, removal and disposal of the actual not suspected presence of **communicable diseases** from insured property; and
>
> 2)  actual costs of fees payable to public relations services or actual costs of using the Insured's employees for reputation management resulting from the actual not suspected presence of **communicable diseases** on insured property.
>
> ECF No. 1-1 at 32 (emphasis in original).

**Response:**

99.    Interruption By Communicable Disease coverage is an Additional Time Element Coverage Extension under the Policy.  ECF No. 1-1 at 8.

**Response:**

100.    The Policy's Interruption By Communicable Disease provision provides:

> If a **location** owned, leased or rented by the Insured has the actual not suspected presence of **communicable disease** and access to such **location** is limited, restricted or prohibited by:
>
> 1)  an order of an authorized governmental agency regulating the actual not suspected presence of **communicable disease**; or
>
> 2)  a decision of an Officer of the Insured as a result of the actual not suspected presence of **communicable disease**,
>
> this Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY at such **location** with the actual not suspected presence of **communicable disease**.

ECF No. 1-1 at 64–65 (emphasis in original).

**Response:**

101.    The Policy's Interruption By Communicable Disease provision further provides:

> This Policy does not insure loss resulting from:
>
> 1)  the enforcement of any law or ordinance with which the Insured was legally obligated to comply prior to the time of the actual spread of **communicable disease**.

ECF No. 1-1 at 65 (emphasis in original).

**Response:**

102.    The Communicable Disease Response and Interruption By Communicable Disease coverages are exceptions to the Contamination Exclusion and Loss of Use Exclusion.  Kurzweil Decl. Ex. 37, Reed Tr. at 99:16–100:4; Kurzweil Decl. Ex. 38 at FMG_0006340 (slide 2).

**Response:**

103.    The Communicable Disease Response and Interruption By Communicable Disease coverages do not require "physical loss or damage" and are subject to an aggregate sublimit of $1 million.  Kurzweil Decl. Ex. 21, Rudnick Tr. at 47:11–48:1; Kurzweil Decl. Ex. 39, Cook Tr.

at 107:11–108:3; Kurzweil Decl. Ex. 22, Berkowitz Tr. at 184:20–185:5; ECF No. 1-1 at 12–15, 32, 64–65.

**Response:**

V.    **Thor's Insurance Claim and Filing of this Lawsuit**

104.    On March 26, 2020, Thor sent a letter to FM Global claiming that Thor had suffered "loss, expense, and/or damage in a number of forms covered under the Policy, including, but not limited to, cleaning and other remediation of property exposed to coronavirus, loss of earnings, loss of profit, extra expenses incurred to operate its business as normal, and loss of rental income." ECF No. 27-1.

**Response:**

105.    FM Global responded by letter on April 14, 2020, acknowledging receipt of Thor's March 26 letter and stating its understanding that the claim was being "submitted under the Policy's ADDITIONAL COVERAGES for COMMUNICABLE DISEASE RESPONSE and INTERRUPTION BY COMMUNICABLE DISEASE," providing the full language of those coverage provisions. FM Global's letter also requested further information from Thor—including information identifying the insured locations which had the actual, not suspected, presence of COVID-19 and information as to how it was determined that the identified locations had the actual presence of COVID-19—so that FM Global could "proceed with [its] investigation" and "confirm any applicable coverages." ECF No. 27-2.

**Response:**

106.    Thor responded by letter on April 24, 2020, stating that "[w]hile certain of Thor's losses due to coronavirus may be covered under [the communicable disease] coverages," it also believed that some or all of its still-unidentified losses were covered under "the general coverage

grants for property damage and time element coverage, as well as multiple time element coverages including civil authority and ingress/egress coverages." Thor also stated it would "respond to all reasonable requests for information as soon as possible" and would "provide FM [Global] with a proof of loss as required by the policy." ECF No. 27-3.

**Response:**

107.    On April 30, 2020, Thor filed this lawsuit against FM Global for anticipatory breach of contract and declaratory judgment, claiming coverage under, among other things, the "communicable disease," "time element," "civil or military authority," ingress/egress," "extra expense," "contingent time element," "expediting expenses," and "delay in startup" coverages. ECF No. 1 ¶ 58.

**Response:**

**VI.    The Parties' Understanding of the Policy**

108.    FM Global provides "policy commentaries" to its policyholders that explain certain provisions in the Policy. The "policy commentaries" are available to policyholders at any time through FM Global's MyRisk platform—an online portal for FM Global policyholders. *MyRisk*, FM Global, https://www.fmglobal.com/research-and-resources/tools-and-resources/myrisk (last visited Sept. 14, 2022). Kurzweil Decl. Ex. 40.

**Response:**

109.    FM Global's two most recent "policy commentaries," issued in 2016 and 2019, explain that "there is no coverage provided [under the Policy] when a business is closed because a white powder is discovered on a hallway floor and is suspected to be anthrax, regardless of whether or not the powder is anthrax. However, coverage is provided [under the Policy] when actual (not suspected) contamination is the direct result of physical damage of the type insured.

As an example, if an ammonia line is struck by a forklift truck and the escaping ammonia contaminates the building, the resulting damage is covered." Kurzweil Decl. Ex. 41 at FMG_0006225; Kurzweil Decl. Ex. 42 at FMG_0006079.

**Response:**

110.    FM Global also holds "policy workshops" for its policyholders at which an FM Global representative walks through the policy and educates the policyholders on the various coverages. Kurzweil Decl. Ex. 37, Reed Tr. at 28:3–10.

**Response:**

111.    One of FM Global's "policy workshops" discusses what the "policy response" would be to a "loss scenario" where the insured property "is located adjacent to an apartment complex" and "[p]ublic authorities restrict access to [the insured property] following the discovery of Ebola in the apartment complex." Kurzweil Decl. Ex. 43 at FMG_0006335.

**Response:**

112.    The answer key for this "loss scenario" explains that "[i]nterruption by communicable disease coverage would not apply . . . since the coverage requires that Ebola be present at the insured's location" and that "civil authority would not apply since that coverage requires physical loss or damage of the type insured, and presence of a communicable disease does not constitute physical loss or damage." Kurzweil Decl. Ex. 43 at FMG_0006336.

**Response:**

113.    On January 31, 2020, FM Global's Vice President of Operations, Josh Larew, sent an email to the FM Global's client services team with guidance regarding how to handle coronavirus coverage claims. Larew's email explained that "[f]or there to be coverage for the coronavirus, there has to be the actual (not suspected!) presence of the disease at a location owned

or rented by the insured" and then "[t]he next step is the trigger that either the government or an officer of the company shuts down the location."  Kurzweil Decl. Ex. 44, Muir Ex. 1.

**Response:**

114.    On March 17, 2020, Karla Henriquez—the FM Global Account Manager for Thor's account—emailed Raizy Berkowitz a copy of FM Global's "Communicable Disease slip sheet," which explained that:

> The FM Global Advantage® policy includes coverage for communicable disease. Communicable Disease Response covers costs to clean up, remove and dispose of a communicable disease at your owned, leased or rented location, plus public relations expenses; and Interruption by Communicable Disease provides time element coverage while you are shut down and as your business recovers.

and:

> Coverage can be triggered if a location owned, leased or rented by the Insured has the actual, not suspected, presence of a communicable disease, and access is limited, restricted or prohibited by an Officer of the Insured or by an authorized governmental agency.

> Kurzweil Decl. Ex. 45, Def.'s Ex. 086.

**Response:**

115.    Raizy Berkowitz forwarded Ms. Henriquez's March 17 email, along with FM Global's "Communicable Disease slip sleet," to Thor's Chief Financial Officer Michele Ricca, MSG's Craig Barnet, and Lockton's David Brandt and Josh Goddard.  Kurzweil Decl. Ex. 45, Def.'s Ex. 086.

**Response:**

116.    On March 18, 2020, FM Global posted a memorandum on its MyRisk platform advising policyholders of coverages available for the coronavirus pandemic under FM Global's all-risk policy.  The memorandum explained that the Communicable Disease Response and Interruption by Communicable Disease provisions apply to certain coronavirus-related losses, with

the Communicable Disease Response provision "insur[ing] clean up costs as well as public relations services expenses" and the Interruption by Communicable Disease provision "insur[ing] business interruption."   The memorandum further explained that for these coverages to apply, "there must be the actual, not suspected, presence of the disease at the insured location" and "access to the location must be limited, restricted or prohibited for more than 48 hours due to the actual, not suspected, presence of the communicable disease."  Kurzweil Decl. Ex. 46, Rudnick Ex. 9; Kurzweil Decl. Ex. 21, Rudnick Tr. at 83:2–6.

**Response:**

117.    Prior to Thor binding coverage with FM Global on March 13, 2020, Lockton never told Thor that Thor had available to it more than $1 million in coverage under the Policy for COVID-19 losses, and no one at Thor ever suggested to Lockton that Thor believed it had more than $1 million in COVID-19 coverage under the Policy.  Kurzweil Decl. Ex. 25, Brandt Tr. at 100:18–101:9.

**Response:**

118.    On March 15, 2020, the day Thor's Policy took effect, Raizy Berkowitz emailed Lockton requesting information on whether the Policy would provide coverage for coronavirus-related losses.  Kurzweil Decl. Ex. 47, Def.'s Ex. 034.

**Response:**

119.    After receiving Ms. Berkowitz's email, Punit Sanganee—a Senior Vice President at Lockton—emailed David Brandt individually, stating that Thor would "need to prove there is disease on the premises" and noting that "it's a small sublimit."  Kurzweil Decl. Ex. 47, Def.'s Ex. 034.

**Response:**

120.     Mr. Brandt then responded to Ms. Berkowitz that there was "probably not" coverage for coronavirus-related losses "unless there is a confirmed case at your location(s)" but that he was "logging on to give this the thorough response it deserves."  Kurzweil Decl. Ex. 48, Def.'s Ex. 035.

**Response:**

121.     Approximately 40 minutes later, Mr. Brandt emailed Ms. Berkowitz, explaining that "property policies require a physical trigger (damage to Thor's property) to engage any time element coverage" and that "coverage grants surrounding the coronavirus in today's Property marketplace are not common and when/if provided are limited in scope by sublimit, definitive coverage language and a physical coverage trigger" but that "FM is unique in that they do provide two small sublimits ($1,000,000 in aggregated coverage for both of the following **combined**) termed/defined as follows: . . . 1. Communicable disease response . . . 2. Interruption by communicable disease."   Mr. Brandt noted that the Communicable Disease Response and Interruption by Communicable Disease coverages "require the actual & confirmed presence of an infected individual at an insured location, are subject to a $1,000,000 aggregated sublimit **combined**, are subject to a 48 hour waiting period, and are subject to additional terms & exclusions within your policy."  Kurzweil Decl. Ex. 49, Def.'s Ex. 036 (emphasis in original).

**Response:**

122.     Mr. Brandt's email did not mention any other provisions in the Policy under which Thor would be entitled to coverage for coronavirus-related losses.  Kurzweil Decl. Ex. 49, Def.'s Ex. 036.

**Response:**

123.    The next day—March 16, 2020—Ms. Berkowitz forwarded Mr. Brandt's email to Joseph Sitt, Melissa Gliatta, Michele Ricca, and Danielle D'Ambrosio, and wrote, "Please see below.  I reviewed the [Policy] language with [MSG] and we came to the same conclusion.  If we have a confirmed case of COVID 19, there could be $1M of coverage."  Kurzweil Decl. Ex. 50, Def.'s Ex. 084; Kurzweil Decl. Ex. 22, Berkowitz Tr. at 248:3–250:11.

**Response**:

124.    The email from Ms. Berkowitz referred to in the preceding paragraph did not mention any other sources of coverage under the Policy for the presence of COVID-19 or SARS-CoV-2 on Thor's premises.  Kurzweil Decl. Ex. 50, Def.'s Ex. 084.

**Response:**

125.    On March 25, 2020, Mr. Barnet adopted Mr. Brandt's analysis as his own and sent it to a representative of the Mashantucket Pequot Tribal Nation, one of Mr. Barnet's clients who was also insured by FM Global.  Kurzweil Decl. Ex. 35, Def.'s Ex. 087 at MSG0003693–96; Kurzweil Decl. Ex. 28, Barnet Tr. at 122:4–123:13.

**Response:**

126.    Mr. Barnet stated in his email that, in his opinion, "the most straightforward reading of the policy . . . is that costs incurred due to coronavirus, which fits the policy definition of communicable disease, should be subject to that $1 million limit" and that the Policy's Contamination Exclusion "would seem to straightforwardly apply to coronavirus."  Kurzweil Decl. Ex. 35, Def.'s Ex. 087 at MSG0003695–96.

**Response:**

127.    Mr. Barnet's email presented various "arguments around the most straightforward reading of the policy," such as an argument "that coronavirus causes physical loss or damage," but

noted that "[o]ne issue with this argument is that the policy has an exclusion for 'loss of market or loss of use,' so we may be limited in arguing that the property is not damaged, it is just unusable." Kurzweil Decl. Ex. 35, Def.'s Ex. 087 at MSG0003695–96.

**Response:**

128.    Mr. Barnet's email also stated:

> If coronavirus is a communicable disease and the contamination exclusion does not apply, the natural response is that coverage should be limited to the communicable disease coverages.  However, the communicable disease coverages apply only in specific circumstances, that is, in response to a government order 'regulating the actual not suspected presence of communicable disease' or in response to a decision of an officer of Thor as a result of the actual not suspected presence of communicable disease.  We can argue that the communicable disease sublimit only applies in these specific circumstances.  This has ramifications, to be sure, if someone tests positive in a building and the decision was made by the [insured] to close the building as a result, losses well in excess of $1 million could be capped at $1 million recovery under the property policy.  However, other sources of lost business, such as individuals not traveling and staying in hotels and visiting our [property] out of fear of the virus, would still be covered as direct time element, contingent time element, civil or military authority, ingress/egress, or logistics extra cost.  The weakest part of this argument is that the communicable disease coverage is named as an additional time element coverage extension, implying that the coverage would not exist but for that provision.  However, we can argue the headings of the policy do not dictate coverage, the terms themselves do, and here we fall within the terms of the time element coverages even if FM mistakenly thought it was a coverage extension.

> Kurzweil Decl. Ex. 35, Def.'s Ex. 087 at MSG0003696.

**Response:**

129.    Mr. Barnet later forwarded this analysis to Ms. Berkowitz and Thor's Chief Operating Officer, Melissa Gliatta.  Kurzweil Decl. Ex. 35, Def.'s Ex. 087.

**Response**:

130.    On March 25, 2020, Raizy Berkowitz was scheduled to participate in a "Coronavirus Real Estate Roundtable" hosted by Lockton at which attendees would discuss,

among other topics, "Business Income Losses—How are insurers responding?"  Michelle Ricca

instructed Ms. Berkowitz to "take notes" and "gather[] as much information as possible on what

insurance [companies] and other are doing" but not to participate in the discussions on behalf of

Thor.  Kurzweil Decl. Ex. 51, Def.'s Ex. 061.

**Response:**

131.    The notes from Lockton's March 25, 2020 Coronavirus Real Estate Roundtable,

which were sent to Thor, stated that "[t]he consensus of most legal pundits and insurance experts

is that most business income policies do NOT cover shutdowns due to viral pandemics" and that

"[m]ost property policies require a physical damage trigger to make BI available."  Kurzweil Decl.

Ex. 52 at THOR0005787; Kurzweil Decl. Ex. 53 at THOR0005788.

**Response:**

132.    In late March 2020, Thor was considering using the Palmer House hotel as a

quarantine center for people who were infected with COVID-19 but who did not require

hospitalization.  Kurzweil Decl. Ex. 54, Def.'s Ex. 075 at LOCKTON0008887; Kurzweil Decl.

Ex. 4, D'Ambrosio Tr. at 302:2–11.

**Response:**

133.    Craig Barnet told Thor that they would need to "secure approval" from FM Global

before using the hotel as a quarantine center because "this would be a 'material change' in the risk

profile of the asset."  Kurzweil Decl. Ex. 54, Def.'s Ex. 075 at LOCKTON0008887.

**Response:**

134.    FM Global and Thor agreed that if Thor was to move forward with the proposal to

use the Palmer House as a quarantine center, the Policy would need to be modified to reduce the

sublimit for the communicable disease coverages at the Palmer House.  Kurzweil Decl. Ex. 54,

Def.'s Ex. 075 at LOCKTON0008880.

**Response:**

135.    Thor did not suggest to FM Global that using the hotel as a quarantine center for

COVID-19 patients could trigger coverage under any other Policy provision.  Kurzweil Decl. Ex.

54, Def.'s Ex. 075; Kurzweil Decl. Ex. 22, Berkowitz Tr. at 149:16–150:22.

**Response:**

136.    As of April 14, 2020, it was the understanding of Joseph Sitt and Raizy Berkowitz

that the Policy imposed a "$1M virus limit."  Kurzweil Decl. Ex. 35, Def.'s Ex. 087; Kurzweil

Decl. Ex. 22, Berkowitz Tr. at 282:22–283:23.

**Response:**

137.    Raizy Berkowitz, who testified as Thor's 30(b)(6) corporate representative on

"Thor's knowledge and understanding of any or all terms included in and the work of the policy,"

agreed that her "basic understanding" of the Contamination Exclusion was that "the inability to

use or occupy property would include the loss of rental income."   Kurzweil Decl. Ex. 22,

Berkowitz Tr. at 43:24–44:7; Kurzweil Decl. Ex. 55, Berkowitz Tr. at 438:12–439:9.

**Response:**

**VII.    Thor Has Not Presented Any Evidence of the Actual, Not Suspected, Presence of SARS-CoV-2 or COVID-19 on Thor's Properties**

138.    Danielle D'Ambrosio testified as Thor's 30(b)(6) corporate representative on the

topics of "the actual or potential impact of the COVID-19 pandemic on any of the covered

properties" under the Policy, and "the actual not suspected presence of SARS-CoV-2 at any of the

covered properties" under the Policy, among others.  Kurzweil Decl. Ex. 56, Def.'s Ex. 001;

Kurzweil Decl. Ex. 4, D'Ambrosio Tr. at 14:6–15:5.

**Response:**

139.    In her capacity as Thor's 30(b)(6) corporate representative on the topic of "the actual not suspected presence of SARS-CoV-2 at any of the covered properties," Ms. D'Ambrosio testified that she "can't confirm actual COVID presence" at any Thor property.  Kurzweil Decl. Ex. 4, D'Ambrosio Tr. at 311:24–312:4.

**Response:**

140.    Ms. D'Ambrosio testified that Thor did not conduct any investigation to determine if the coronavirus was physically present at any of Thor's properties.  Kurzweil Decl. Ex. 4, D'Ambrosio Tr. at 310:12–311:5.

**Response:**

141.    Ms. D'Ambrosio testified that Thor did not test any surfaces, air, or ventilation systems within Thor's buildings for the presence of coronavirus.  Kurzweil Decl. Ex. 4, D'Ambrosio Tr. at 310:12–311:12.

**Response:**

142.    Ms. D'Ambrosio testified that Thor "didn't test anyone for COVID-19" at Thor's properties but rather received reports from tenants who would "come to [Thor] saying that they had COVID-19."  Kurzweil Decl. Ex. 4, D'Ambrosio Tr. at 266:9–17.

**Response:**

143.    Thor's Chief Financial Officer, Michelle Ricca, testified that she was not aware of any efforts by Thor to identify actual cases of COVID at any of Thor's properties.  Kurzweil Decl. Ex. 3, Ricca Tr. at 248:15–19.

**Response:**

144.    Joseph Sitt testified that he was not able to identify any Thor property where there was the actual presence of coronavirus.  Kurzweil Decl. Ex. 57, Sitt Tr. at 148:17–152:7.

**Response:**

145.    Raizy Berkowitz testified that she could not identify any Thor property where there was the actual presence of coronavirus.  Kurzweil Decl. Ex. 22, Berkowitz Tr. at 33:10–34:2.

**Response:**

146.    In response to FM Global's interrogatory requesting that Thor "[s]tate all facts and identify all documents and communications supporting Thor's contention that it 'has had confirmed cases of COVID-19 at multiple [Covered P]roperties,'" Thor only identified documents containing emails from tenants or property management companies at five properties— Gateway II, 215 West 116th Street, 1005 E. St. Elmo, Kirby, and 88 Greenwich Street— reporting a positive case of coronavirus on the premises.  Kurzweil Decl. Ex. 23, Pl.'s Resp. to 2d ROGS No. 5.

**Response:**

147.    For each of these communications, Thor took no steps to request or otherwise seek verification of these reports of suspected cases.   Kurzweil Decl. Ex. 58 at THOR0005545–47; Kurzweil Decl. Ex. 59 at THOR0005548–51; Kurzweil Decl. Ex. 60 at THOR0005556–57; Kurzweil Decl. Ex. 61 at THOR0010792–94; Kurzweil Decl. Ex. 62 at THOR0010953–56; Kurzweil Decl. Ex. 63 at THOR0013967–69; Kurzweil Decl. Ex. 4, D'Ambrosio Tr. at 266:9–17.

**Response:**

148.    The communication concerning the property at 1005 E. St. Elmo expressly stated that it was only "a suspected COVID-19 case at one of the buildings."  Kurzweil Decl. Ex. 64 at THOR0030524.

**Response:**

149.    Thor's virology expert, Dr. Justin Lessler, explained that his report "provides no opinion on or calculation of the number of individuals who were infectious or actively spreading the virus during any time period." Kurzweil Decl. Ex. 8, Lessler Ex. 03 ¶ 5c; Kurzweil Decl. Ex. 9, Lessler Tr. at 105:16–22.

**Response:**

150.    Pursuant to Magistrate Gorenstein's September 13, 2022 Opinion & Order, Thor's epidemiological expert, Dr. Igor Burstyn, is excluded from offering "opinions and analysis regarding the presence of COVID-19 at Thor properties in March 2020."  ECF No. 144.

**Response:**

151.    Pursuant to Magistrate Gorenstein's September 13, 2022 Opinion & Order, Dr. Burstyn is only permitted "to provide to the jury a compilation of stay-at-home orders and to testify as to their existence as they would be understood by an expert in the field of epidemiology." ECF No. 144.

**Response:**

152.    Thor has adduced no admissible expert testimony regarding the actual presence of SARS-CoV-2 or COVID-19 at its insured properties.

**Response:**

## VIII.    Thor Has Not Presented Any Evidence that SARS-CoV-2 or COVID-19 Caused a Physical Alteration to Any of Thor's Properties

153.    Raizy Berkowitz testified as Thor's 30(b)(6) corporate representative on the topics of "Any and All factual bases for Each of the allegations made in the Complaint," "[t]he factual bases for Any and All damages alleged in the Complaint," "Thor's Claim under the Policy," and

"Any and All factual bases underlying the Claim," among others.  Kurzweil Decl. Ex. 56, Def.'s Ex. 001; Kurzweil Decl. Ex. 22, Berkowitz Tr. at 34:3–25, 41:5–10, 52:24–53:7.

**Response:**

154.    Testifying in her capacity as Thor's 30(b)(6) corporate representative, Ms. Berkowitz agreed that she was "not familiar with anything in the [P]olicy which says that the presence of a communicable disease by itself is physical loss or damage."  Kurzweil Decl. Ex. 22, Berkowitz Tr. at 194:20–23.

**Response**:

155.    Testifying in her capacity as Thor's 30(b)(6) corporate representative, Ms. Berkowitz agreed that she had "no information regarding the presence of the coronavirus constituting physical damage."  Kurzweil Decl. Ex. 55, Berkowitz Tr. at 344:9–12.

**Response:**

156.    Ms. Berkowitz also testified, in her capacity as Thor's 30(b)(6) corporate representative, that she was not aware of any Thor property that had undergone repairs or been replaced as a result of the presence of the coronavirus.  Kurzweil Decl. Ex. 55, Berkowitz Tr. at 327:19–328:21.

**Response:**

157.    Thor's CEO, Joseph Sitt, testified that he was not able to identify any physical loss or damage suffered at any Thor property.  Kurzweil Decl. Ex. 57, Sitt Tr. at 150:16–152:7.

**Response:**

158.    Mr. Sitt testified that he was not able to identify any repairs that Thor had to make at any of its properties as a result of the presence of the coronavirus beyond routine cleaning. Kurzweil Decl. Ex. 57, Sitt Tr. at 101:23–102:12.

**Response:**

159.     In response to FM Global's interrogatory asking Thor to state "all steps that have been taken or will need to be taken to repair or replace Each Covered Property that suffered physical loss or damage," Thor responded that "witnesses have testified to steps that have been taken or will need to be taken to repair or replace Covered Property that suffered physical loss or damage" and cited to testimony from certain Thor deponents, all of which reference only cleaning efforts made at Thor's properties.   Kurzweil Decl. Ex. 65, Pl.'s Supp. Resp. to ROG No. 1(v) (citing Kurzweil Decl. Ex. 22, Berkowitz Tr. at 99:12–20; Kurzweil Decl. Ex. 55, Berkowitz Tr. at 358:17–359:1; Kurzweil Decl. Ex. 4, D'Ambrosio Tr. at 314:4–21, 318:10–321:5; Kurzweil Decl. Ex. 66, Gliatta Tr. at 175:3–20; Kurzweil Decl. Ex. 57, Sitt Tr. at 95:15–96:5).

**Response:**

Dated: November 10, 2022                    /s/ Harvey Kurzweil

Harvey Kurzweil
Kelly A. Librera
George E. Mastoris
Adam P. Moskowitz
WINSTON & STRAWN LLP
New York, NY 10166
Tel.: (212) 294-6700
Fax: (212) 294-4700
HKurzweil@winston.com
KLibrera@winston.com
GMastoris@winston.com
APMoskowitz@winston.com

Robert F. Cossolini
FINAZZO COSSOLINI O'LEARY
MEOLA & HAGER, LLC
67 East Park Place, Suite 901
Morristown, NJ 07960
Tel.: (973) 343-4960
robert.cossolini@finazzolaw.com

*Attorneys for Defendant Factory Mutual
Insurance Company*